The **STATE** of Ohio, Appellee,

v.

**HAIGHT, Appellant.**

[Cite as *State v. Haight* (1994), 98 Ohio App.3d 639.]

Court of Appeals of Ohio,
Franklin County.

No. 93APA08–1133.

Decided Nov. 15, 1994.

640

Michael Miller, Franklin County Prosecuting Attorney, *Joyce Anderson* and *Susan E. Day,* Assistant Prosecuting Attorneys, for appellee.

*Judith M. Stevenson,* Franklin County Public Defender, and *John W. Keeling,* Assistant Public Defender; *Turner & Wright* and *Carol A. Wright,* for appellant.

TYACK, Judge.

On June 14, 1991, Carl Friend Haight was indicted on two counts of aggravated murder with death penalty specifications, one count of aggravated burglary and one count of aggravated robbery. The aggravated burglary and aggravated robbery charges each included prior offense specifications as a result of Haight's previous conviction for aggravated burglary.

When indicted, Haight was already in custody at the Franklin County Corrections Center. As a result, he was served the indictment on the same day it was filed. He was arraigned on the charges on June 19, 1991. He entered a plea of not guilty at arraignment.

The case was initially set for trial on July 22, 1991. The trial judge assigned to the case continued the case to October 25, 1991 "Upon motion of the Defendant." The entry continuing the case was signed by an attorney in a space on a

preprinted form and was not signed by Haight. As of the date the entry was filed, no attorney had been appropriately assigned to represent Haight.

On July 31, 1991, the attorney filed a demand for discovery on behalf of Haight. The attorney also filed a request for notice of intention to use evidence.

On or after August 1, 1991, trial counsel were officially appointed. The lead counsel indicated that he had been appointed July 17, 1991—five days before the first trial date. Cocounsel indicated that he was appointed on August 1, 1991.

On September 10, 1991, the two attorneys filed the only significant motion they would file before Haight was found guilty of aggravated murder with death penalty specifications. The motion was a motion to compel discovery. No ruling on the motion was ever journalized.

Apparently, at least some discovery was provided since the prosecution filed its own demand for discovery on September 11, 1991.

The case did not proceed to trial on October 25, 1991. No entry continuing the case was filed until January 10, 1992. The entry continued the case until February 10, 1992. Apparently, the entry was filed after it was prepared by an assistant prosecuting attorney. The signature of one of the defense counsel is affixed "per phone authority."

On January 16, 1992, a judgment entry was filed which indicates that the issue of Haight's competence to stand trial had been raised. Therefore, Haight was scheduled for a psychiatric examination. A second entry filed the same day called for Haight to be examined "pursuant to defendant's plea of not guilty by reason of insanity." No such plea is present in the record.

On January 21, 1992, another entry, this time continuing the case to April 20, 1992, was filed.

On February 26, 1992, the trial court signed an entry appointing a mitigation specialist to assist in the defense of Haight. The individual appointed was authorized at that time to work a maximum of forty hours with pay.

On March 26, 1992, the services of a psychiatrist, Lewis Lindner, M.D., were authorized by the trial court. Lindner was also labeled as a "mitigation specialist."

Since the case was scheduled for a jury trial on April 20, a special venire was drawn. As part of the trial preparation, the records of Franklin County Children Services regarding Haight were obtained.

On April 20, 1992, another psychiatric examination was ordered by the trial court "pursuant to defendant's plea of not guilty by reason of insanity." Again, no such plea is present in the record. Apparently, five days before trial, defense counsel had presented the prosecuting attorney's office and the trial court a

report indicating that Haight had been legally insane at the time of the offenses. As a result, the case was continued on the motion of both parties to May 26, 1992. A second special venire was drawn for the May 26, 1992 trial date.

The second pretrial motion filed on behalf of Haight was filed on May 22, 1992. It allowed Haight to be transported from the Franklin County Corrections Center to a funeral home to view the body of his stepfather.

On May 26, 1992, Haight appeared and acknowledged that he had signed a written waiver of trial by jury. The issues of Haight's competency to stand trial and his sanity were not discussed on the record. The direct questions asked of Haight by the originally assigned trial judge were:

"Mr. Haight, I want to know, is this your signature on this waiver?

"The Defendant: Yes, sir.

"Judge Crawford: You understand you have a right to have this tried by a jury of 12 individuals?

"The Defendant: Yes, sir."

Apparently, the originally assigned trial judge intended to ask Haight if he was willing to waive his right to a trial by jury. However, the conversation got diverted to the fact that one of the three judges who would hear the case had been an attorney in the office of the prosecuting attorney at the time that Haight was indicted. Haight never was asked more about his willingness to waive his right to a trial by jury.

The two attorneys appointed to represent Haight, however, indicated their willingness for the recently appointed judge to sit in judgment on the case.

Neither the office of the prosecuting attorney nor defense counsel revealed to the trial judges at that time that a significant reason why defense counsel were urging Haight to waive his right to a trial by jury was that an agreement had been reached between the prosecution and the defense that if Haight waived his right to a trial by jury and minimized objections to certain evidence in the prosecution's case, the prosecution would inform the three-judge panel during the mitigation phase of the trial that the prosecution and the next of kin were not in favor of the death penalty being imposed on Haight. More details of this agreement are set forth under our discussion of the third assignment of error below.

To cement the jury waiver and cause the trial to have commenced, immediately after the discussion of the written waiver a witness was called. This first witness was Alan Brown, an officer with the Columbus Division of Police. Office Brown had been involved in discovering the body of Terry Tagg at 1535 Union Avenue in Columbus on June 5, 1991.

The trial was continued for two days after Office Brown testified.

Records filed with the court indicate that the attorney appointed as cocounsel to represent Haight spent a total of less than seven hours working on Haight's case during the first five months of representation. He claimed he spent an additional 46.75 hours during calendar year 1992 before the day the trial commenced. Of the 46.75 hours claimed, 17.5 hours are listed as travel, leaving less than thirty additional hours for all other kinds of pretrial preparation, including interviews, investigation, research, writing, negotiations, conferences and miscellaneous other time expenditures.

The lead counsel has apparently not sought payment for the services he rendered, so we are unable to ascertain completely what effort he put into Haight's defense other than fifteen hours of trial time during the guilt-innocence phase of the proceedings and the 3.5 hours of hearing time during the mitigation phase of the proceedings claimed by cocounsel in his affidavit for payment. Some inferences can be drawn from the minimal filing of pretrial motions.

The trial resumed on May 28, 1992, with a detailed opening statement from the prosecution. Lead defense counsel asked to defer the opening statement for the defense until the conclusion of the state's case. The court granted permission to defer the opening statement. At the conclusion of the state's evidence, lead counsel was asked whether he now wished to make an opening statement. He responded simply, "No, your Honor." As a result, no opening statement was made at the guilt-innocence phase of the proceedings on behalf of Haight.

The state then resumed its presentation of evidence, following a stipulation that permitted the prosecution to enter approximately one hundred photographs and approximately forty other exhibits into evidence through the testimony of witnesses who would not otherwise be able to testify about the photographs and/or exhibits because of a lack of personal knowledge. Officer Steven Thrall of the Crime Scene Search Unit of the Columbus Division of Police then testified about evidence collected at the scene of the homicide and in regard to the scene.

The third prosecution witness was Dana Norman, formerly a member of the Crime Scene Search Unit of the Columbus Division of Police. Sergeant Norman testified about a radio found near the body of Terry Tagg and a set of locking pliers found near a car in the garage at 1535 Union Avenue. Sergeant Norman had been responsible for collecting as evidence a sledgehammer which had been used to beat Tagg to death. Sergeant Norman also helped collect tiles and other items with blood on them, including bloody footprints. He and his partner had processed several items for latent lifts and had found fingerprints (which were identified as coming from Haight) on the radio. Haight's fingerprints were also found on a mirror cabinet door at 1535 Union Avenue, on the car in the garage

and on a television stolen from the house. A fingerprint on the sledgehammer did not contain sufficient detail to allow for comparison.

The fourth state's witness was Edward K. Kallay, Jr., a homicide detective with the Columbus Division of Police. Detective Kallay went to the homicide scene in the early hours of June 5, 1991. He specifically noticed that although blood splatters were located all around the body, a paper bag at the top of the steps over the landing where the body was found did not have blood splatters on it. The bag contained the radio mentioned in earlier testimony and other items. Detective Kallay also took note of a basement window which had a pane of glass broken out and some grass on the floor nearby.

Detective Kallay and other officers working on the homicide canvassed the neighborhood surrounding 1535 Union Avenue. They received from someone a description of an individual who had been seen in the area supposedly during the early morning hours of June 5, 1991. The description was that of a male white in his mid-thirties, five feet eight inches to five feet nine inches tall, and one hundred eighty pounds. The individual reportedly had long, dark brown curly hair and facial hair, including at least a moustache. The individual also reportedly was wearing blue jeans and a T-shirt.

While cruising the area near 1535 Union Avenue the next day, Detective Kallay saw someone who he felt matched the description. Detective Kallay and his partner approached the individual, who identified himself as Carl Haight. Haight was cooperative with the police officers, but told them a story about his whereabouts the previous evening which did not include his being at the scene of the homicide. Haight showed the officers the bottoms of his tennis shoes when requested to do so. The officers felt that the pattern on the bottom of the shoes matched bloody footprints at the scene of the homicide. They took Haight to the scene and compared the soles of the shoes to the bloody footprints.

Haight indicated that he lived with his mother, but frequently stayed in a tent he pitched in the backyard of Renee Rundio's apartment. On other occasions, he stayed at a shelter run by Volunteers of America.

The officers measured the distance from 1535 Union Avenue to Renee Rundio's apartment and found the distance to be three tenths of a mile or less. While at the apartment, the officers questioned Rundio and her husband, Orson Rundio. As a result of the questioning, the officers collected some clothing from her clothes dryer and a television from a "block-like" dumpster in back of their apartment. The officers also collected as evidence the shoes Haight was wearing when he encountered the officers. The shoes smelled of bleach. The clothes from the dryer consisted of a blue T-shirt and a pair of blue jeans. Haight was then arrested.

Later, other police officers returned to the Rundio apartment following a telephone call from Renee Rundio. They retrieved a floor jack and a two-wheel grinder from a storage area at the apartment. Rundio's fingerprints were found on the grinder.

On cross-examination, Detective Kallay testified that the individuals who gave the description that led the officers to approach Haight had seen the individual in the vicinity of 1535 Union Avenue at about 9:00 p.m. Detective Kallay also testified that the description indicated that a motorcycle hat had been worn, but Haight was not wearing such a hat when they encountered him.

The fifth prosecution witness was Orson Rundio. On June 4, 1991, he was living with his wife, Renee, and their four children at an apartment on Martha Avenue in Columbus. Haight came to the apartment around 11:30 or 11:45 p.m. carrying a black and white television. Haight seemed drunk. He had blood on his hands and arms.

Haight plugged the television in, but it did not work. He then talked to Mr. Rundio briefly, indicating that he (Haight) "got jumped by somebody and got in a fight." Haight showered and then lay on a couch before going to sleep. Mr. Rundio identified the clothing which the police had taken from his apartment as being the clothing which he thought Haight had worn on June 4, 1991.

The cross-examination of Orson Rundio at trial was delayed so defense counsel could hear a tape recording of what Mr. Rundio had said to police on the day Haight was arrested. The delay was also related to the fact that Renee Rundio had not appeared to testify and her husband was expected to help locate her and encourage her to come to court. The trial court insisted that another witness begin to testify immediately rather than break the trial to allow the tape recording to be reviewed and the cross-examination to occur in the normal order of a trial.

Peggy Tagg, the widow of Terry Tagg, then testified on direct examination. Ms. Tagg had lived in another apartment in the complex where the Rundios resided. The Taggs had purchased the property at 1535 Union Avenue in April 1991 and the couple had worked on fixing it up before moving in. Terry Tagg worked at the property virtually every day. Terry kept some tools at the house. The couple also stored some personal property they were not using at the location.

On June 4, 1991, Terry Tagg went over to the Union Avenue property around 2:00 p.m. He expected to return for dinner between 5:00 and 7:00 p.m. He had a habit of staying late into the evening if a project he was working on was not completed. As a rule, he did not work at the property past 11:00 p.m.

When Terry had not returned to their apartment by 2:00 a.m., Peggy Tagg went looking for him. She drove over to the Union Avenue property and noticed that the garage door was open a little. She approached the house, but could not see because no lights were on. She then returned to the car and got a flashlight. When she returned to the house and tried to enter it through the only door for which she had a key, she discovered Terry's body. She then started screaming and ran to the house next door. A neighbor helped her and called the police.

Later, Ms. Tagg identified the black and white television found behind the Rundios' apartment as hers. She acknowledged that some miscellaneous tools might be missing from the house and that the keys her husband had used at the Union Avenue property had never been returned to her. She identified specifically the items recovered from the storage area at the Rundios' apartment.

Mr. Rundio then returned to the witness stand and testified on cross-examination that Haight seemed a little more tense than normal on the evening of June 4.

The parties next stipulated to Haight's conviction for aggravated burglary entered on March 14, 1984 and certain other exhibits.

The next witness was Ronald L. Huston, a latent print examiner employed as a civilian by the Columbus Division of Police. Huston testified as to his identification of the various latent lifts from the homicide scene, the television and the items at the Rundios' apartment.

The eighth witness was Renee Rundio. As noted earlier in this opinion, Ms. Rundio had not responded when subpoenaed. As a result, a bench warrant had been issued and she had been arrested. She was taken to the Franklin County Corrections Center and was brought in custody from there to the courthouse to testify. She appeared in handcuffs, purportedly at her own preference.

Ms. Rundio had known Haight for approximately ten years. In June 1991, he would come to her apartment "every couple days * * * because he didn't have any place to stay." Sometimes he would sleep on her couch and sometimes he would stay in a tent she had pitched outside as a place for her children to play.

When Ms. Rundio returned home at about 5:30 a.m. on June 5, 1991, she found Haight on her couch sleeping. When he awoke, he told Renee that he had broken into a garage and while he was in the garage a man had found him. Haight claimed to have asked the man for a light for a cigarette. Haight then said that he thought he had killed someone. When Renee became upset, Haight told her he was joking.

Renee thought that she saw blood by Haight's ear. She also claimed to have noticed something dark on his pants. She recalled him as wearing jeans, a dark T-shirt and tennis shoes. She identified the T-shirt and tennis shoes previously

described as belonging to Haight and being worn by him that morning when she arrived home.

She described Haight as being "kind of nervous," "kind of edgy," and "kind of shaken" on June 5th. As opposed to her husband's recollection, she recalled Haight as cleaning up when she got up later in the day.

She testified that Haight discussed the events of the previous evening once again. He said he had broken into the garage and had been discovered. Haight claimed that he had asked the man for a light for a cigarette and then had put the man "in a sleeper hold." Then she testified that Haight said he had taken the man into the house and hit him in the head with a sledgehammer. Haight supposedly did not know for sure, but thought he had killed the man. She testified that Haight threatened her by telling her that if she told anyone, the same thing would happen to her.

Renee ordered Haight to get the stolen television out of her house, so he threw it in the trash. He later left for work.

About 1:00 a.m., the police came to Renee's apartment and she cooperated with them. Later in the day, Haight called her from jail and told her that he had hidden some stolen items in her apartment building. He wanted her to sell them and put the money in his account at the jail.

Renee identified a copy of her telephone bill, which reflected a collect telephone call from the Franklin County Corrections Center.

Renee testified that she looked at the stolen property and then called the detectives. She did not recall doing anything with the property, so she did not immediately give an explanation as to why her fingerprints were on the stolen grinder.

On cross-examination, Ms. Rundio acknowledged that her in-court testimony differed in some regards from the tape recording of her interview by police detectives on June 6, 1991. She acknowledged that she had made no mention of the first conversation she now claimed had occurred on June 5, 1991. She also acknowledged some differences as to where blood or other foreign substances were present on Haight's body. She also testified that she had never known Haight to be violent but had always known him as a very gentle person. After her testimony, the trial court released Ms. Rundio on her own recognizance.

The final witness during the state's case was Larry Tate, M.D. Dr. Tate, while employed as a pathologist with the Franklin County Coroner's Office, performed the autopsy on the body of Terry Tagg. Tate initially identified five photographs of the body taken at the coroner's office. He then testified as to a series of blunt-force-type injuries to the facial area and less significant but numerous other injuries. Dr. Tate testified that Mr. Tagg "died of blunt force trauma to the head

and face with multiple skull fractures and effectively massive damage to the front half of his brain."

Following cross-examination, one judge on the panel asked how many blows to the head there had been. Tate could only state that he believed more than one blow had been struck.

The trial resumed the following week and all further testimony on behalf of the state was handled by way of stipulation. The defense objected to none of the state's exhibits and all were admitted. The state then rested.

As indicated earlier, lead counsel then expressed no desire to make an opening statement. Lewis A. Lindner, M.D., testified as the only defense witness.

Dr. Lindner was a psychiatrist primarily employed by the Central Ohio Psychiatric Hospital. He met with Haight ten times in interviews which totaled twenty hours. He reviewed records from Children's Hospital in Columbus, from the Ohio Department of Mental Health, from the Ohio Department of Corrections and from Netcare Corporation. He also reviewed reports from Haight's arrest, discovery material furnished by the prosecuting attorney's office, records from the Franklin County Sheriff's Office and the Columbus Public Schools. He conducted interviews of Haight's father and mother and of his sister Judy. He interviewed people from the neighborhood where the homicide occurred. He also interviewed medical personnel from the former Pittston Hospital in Pennsylvania, from Mt. Carmel Health Center and from Scranton Counseling in Pennsylvania. He conducted telephone interviews with Haight's older sister in Pennsylvania. He also consulted a number of professionals in epileptology, the study of epilepsy.

The background research conducted by Dr. Lindner revealed that Haight had been born in 1963 into poverty and had been raised in impoverished circumstances. He had been schooled primarily in special education classes because he was regarded as a slow learner with attention deficit disorder. He also was treated with Ritalin starting at an early age. He had begun engaging in substance abuse at approximately age eight, with the substance abuse increasing until his incarceration in 1983. He was admitted to Children's Hospital at age eleven for taking an overdose of Valium in what may have been a suicide attempt.

Lindner made a diagnosis in accord with the five axis system established by the American Psychiatric Association in its Diagnostic and Statistical Manual ("DSM"). Axis I addresses diagnoses of major mental disorders. Lindner's principal diagnosis on Axis I was organic personality disorder. The secondary diagnoses were alcohol dependency, cannabis dependency and mixed substance dependency.

Organic personality disorder results from or correlates to physical damage to the individual's brain. A diagnosis of organic personality disorder depends upon

a finding of the existence of one or more of five criteria: (1) unstable affect, (2) recurrent episodes of anger or rage, (3) inappropriate or poor social judgment, (4) emotional apathy, and (5) excessive suspiciousness or paranoid thinking. Lindner found four of the five criteria to be present. The most clearly met criterion was impaired social judgment. However, Haight also displayed occasional paranoid thinking, apathy that is inappropriate to a social situation and instability in his immediate emotions or affect.

Axis II of the diagnostic system addresses other mental disorders, primarily mental retardation and personality disorders. Lindner found Haight to warrant a diagnosis of mild mental retardation.

Axis III addresses physical illness. Lindner found that Haight suffered from impaired vision in his right eye, secondary to trauma, from childhood asthma, and, most significantly, from complex partial seizures. Seizures generally involve disordered electrical activity in the brain, which may manifest itself in specific behaviors, depending upon what area of the brain is affected. Partial seizures involve electrical disturbances in only a part of the brain. Lindner described complex partial seizures, Haight's condition, as follows:

"Complex partial seizures refer to those in which the behavior that the person performs is not just a single stereotyped behavior but something which is very complicated and complex. These generally originate from electrical disturbances deep in the brain rather than on the surface."

Axis IV of the diagnostic system pertains to environmental stressors that are affecting an individual's behavior or psychiatric status. Lindner found:

"[A] long series of stressors, such as poverty and rejection by family, social rejection, lack of success in vocation, school, family relationships, arrests, incarceration, institutionalization, and in some, I believe I arrived at a level of five and designation of extreme for the amount of social stress."

The finding of level 5 is on a scale of 0 to 6.

Axis V involves the individual's overall ability to function in society, rated on a scale of 0 to 100. Lindner assigned a level of 45–55 to Haight, meaning that "he would have a very difficult time functioning in any of the usual community activities."

Lindner's review of the Haight family revealed a family he described as "very dysfunctional and chaotic." Lindner felt that Haight's repeated rejection by his own family had contributed to his very poor self-image.

A review of Haight's records at Lebanon Correctional Institution reveals that he had been medicated with Thorazine while incarcerated. The medication was not necessarily used to treat an active psychosis, but more to assist with his

hyperactivity. He also was medicated at various times with Haldol, Stelazine, Lithium, and Visteril.

Haight related a history of hallucinations, some of which occurred while he was intoxicated. However, he also related an hallucination which occurred while he was incarcerated. In the last hallucination, he saw a two-inch-tall green man who told him to go over and touch the wall in the mud room.

The records from the Ohio Department of Corrections related that on different occasions, Haight had been observed making peculiar, unexplained moves and had been found hiding under a table.

When interviewed by Lindner, Haight usually denied involvement in the Tagg homicide and attributed the fingerprints and other evidence indicating his responsibility to a conspiracy to frame him. In Haight's mind, the conspiracy usually went to the point that the police had lifted his fingerprints and transferred them to items of evidence. On one occasion, Haight, having admitted that he had blackouts, acknowledged that he could have "done anything in a blackout."

Based upon his diagnosis of Haight as to the five axes, Lindner rendered an opinion that Haight suffered from mental illness as defined in the Ohio Revised Code and that Haight was unable to appreciate the wrongfulness of the acts he committed or, in Haight's mind, may have committed.

Lindner was cross-examined by the prosecution and extensively questioned by two of the judges on the three-judge panel.

After the defense rested, the prosecution called two rebuttal witnesses, Mijo Zakman, M.D., and Dr. Kristen Haskins. Dr. Zakman is a psychiatrist, also employed at the Central Ohio Psychiatric Hospital. Dr. Haskins is a psychologist with Netcare Psychiatric Center ("Netcare").

Zakman graduated from medical school in Croatia in 1956. He spent twelve years in the general practice of medicine before he came to the United States to participate in a three-year residency training in psychiatry. He then spent three years supervising other residents at the Central Ohio Psychiatric Hospital. In 1982, he joined the hospital's forensic unit.

Zakman reviewed records from the Ohio Department of Mental Health, the Ohio Department of Corrections and from Netcare, where Haight received treatment from January 3, 1991 until May 24, 1991. Zakman also had the opportunity to review a written report from Lindner to Haight's lead counsel and a report from Dr. Haskins, who first interviewed Haight in regard to competence and later interviewed him in regard to legal sanity.

Zakman interviewed Haight once for ninety minutes. Zakman also interviewed a brother of Haight, the Rundios, and a former employer of Haight. Zakman

visited the homicide scene. Later, he reviewed a videotape of Haight taken at about the time he was arrested.

According to Zakman, Haight was born on March 2, 1963 in Pittston, Pennsylvania. He was the seventh of eight children born into poverty. There was antagonism among the siblings and bad treatment by a stepfather. As a result, Haight failed in school and ended up on the streets, drinking and taking street drugs. Haight got involved in petty thefts and eventually was committed to what was then called the Ohio Youth Commission. While at the Youth Commission, he was medicated with Thorazine.

Later, Haight went to prison for nearly seven years and was arrested for his involvement with the Tagg homicide about six months after he was released from prison. After his release from prison, Haight reconnected with his family to a point, and then the relationship worsened again.

In reviewing treatment records from the Ohio Department of Corrections, Zakman found evidence of Haight's complaining of auditory hallucinations as far back as the summer of 1984. The initial auditory hallucinations were followed shortly by the visual and auditory hallucinations involving the little green man. Haight was then medicated with Haldol, but was not diagnosed as being psychotic.

Haight was discovered eating cigarettes and hiding under a table in the prison cafeteria, purportedly as a part of "acting out" precipitated by the loss of a friendship.

In the spring of 1985, Haight was placed on Thorazine once again and tolerated it well for approximately six months. He then reported "having spells where he is out of place, wondering [sic] with obscured vision, loss of memory, being found in third range or other cells other than his own or no memory of how he got there."

Dr. Helm, a prison psychiatrist, could not tell whether Haight was suffering from a disassociative state. Helm prescribed Trilafon, because Haight had formerly responded well to neuroleptics (drugs which primarily affect psychomotor activity).

After his stepfather died, Haight's condition worsened still and he was placed on Thorazine again. Eventually, side effects of the medication forced the prison psychiatrist to discontinue its use for a relatively brief period of time. Thorazine, was then prescribed again on a reduced dosage. Later, the Thorazine was discontinued and Lithium was prescribed to control manic symptoms. After the Lithium proved unsuccessful, the Thorazine was prescribed once again.

In August of 1987, Haight reported to the prison authorities as feeling like he wanted to explode. In December 1987, he discontinued medication.

In June 1989, Haight returned to Thorazine, followed by Vistaril, an antianxiety agent. In October 1990, he discontinued medication again.

Late in 1990, a prison psychologist administered a Minnesota Multiphasic Personality Inventory ("MMPI"). As to the test results, Zakman testified:

"In the conclusion they said, 'MMPI results substantiated by items survey and comprehension, appears reasonably valid and is congruent with a clinical interpretation of individuals feeling misunderstood and generally feeling they are not a part of the general social environment. Negativism and being perplexed and agitated is often common under extreme stress. Difficulty in focusing on problem-solving is usual[ly] common.'"

The prison psychologists deferred a diagnosis on Axis I and Axis II. The general diagnosis by them was "borderline personality disorder, antisocial personality disorder and borderline intellectual functioning."

Zakman found in the records from the Ohio Department of Corrections information indicating that Haight had made "very solid efforts in trying to acquire a G.E.D., but he couldn't because his scores were between the third and seventh grade repeatedly."

After release from prison on parole, Haight was evaluated by Netcare and treated at Netcare until May 24, 1991, less than two weeks before the homicide. Netcare found Haight to be in need of drug and alcohol treatment, job training and a possible program to help him adjust to life outside prison.

In Zakman's interview, Haight denied having mental health problems in the words " 'I ain't no wacko.' " He acknowledged a long history of drug and alcohol problems. He also indicated a history of blackouts, both while in prison and afterwards. Haight claimed that hallucinations regarding the little green man had occurred more than once, but he did not discuss the hallucinations after the first time because he feared punishment. After his first report of hallucinations, he said that he was placed in an isolation cell at the prison. He viewed the isolation cell as punishment.

In the ninety-minute interview with Zakman, Haight denied involvement with the homicide.

Zakman found Haight to have been "dysfunctional practically all his life," but Zakman did not feel that Haight was legally insane. On a five-axis diagnosis, Zakman found mixed substance abuse as to Axis I. On Axis II, he diagnosed borderline intellectual functioning and antisocial personality disorder. He made no diagnosis as to Axis III. Zakman did make a finding of organic personality disorder because Carl Haight "is mentally retarded, he is of lower intellectual functioning and has a relatively inexpressive, uninvolved presence."

Zakman also observed:

"In addition to this, what has been said, in summary, if one wants to give him the diagnosis of organic personality disorder, one cannot say that he has frequent bursts of anger with violent reacting to minimal provocation. There is no record of this. There is no record of sudden mood changes, within a few minutes crying and being angry and laughing. This doesn't exist in his case to my view. There is no indication that he has in the past really brutally attacked on anyone before he was accused of this offense."

Zakman was not asked his diagnosis as to Axis IV or V.

On cross-examination, Zakman acknowledged that he had done no testing of Haight other than interviewing him and observing him. Zakman had brought the Netcare file on Haight with him and was questioned about Netcare's findings that Haight's recent and remote memory were both impaired. Zakman also acknowledged that the Netcare team which evaluated Haight, including a psychiatrist, found as to Axis I "organic hallucinosis, controlled with meds." The same team also diagnosed hyperactivity and possible organic thought disorder.

The cross-examination revealed that the decision by Netcare not to place Haight on medication less than two weeks before the homicide was made by a nurse in consultation with a social worker, not by a psychiatrist.

No redirect examination of Zakman was conducted.

The final witness for the state was Kristen Haskins, a psychologist with Netcare whose primary duty is performing competency and sanity evaluation for courts in an eight-county area. Haskins also serves as director of Netcare.

Haskins interviewed Haight on three occasions for a total of approximately five hours. She participated in testing of Haight and reviewed the test results. She found Haight to have reading and spelling ability below the third-grade level. His arithmetic was "at about fifth-grade level."

Dr. Haskins also found Haight's performance I.Q. to be in the low forties and his verbal I.Q. to be in the lower seventies. As a result, she viewed him as being "the borderline range of intellectual functioning * * *[,] just above mild retardation and two ranges below mild functioning." Haskins viewed Haight as having "serious learning disabilities, probably based on minimal brain dysfunction."

Some of Haight's testing results suggest visual motor dysfunction in the central nervous system. Haskins also stated, "He is functionally illiterate, with a learning disability more than likely. Also seems to be somewhat anxious, dependent, immature individual."

In interviewing with Haskins, Haight's recollection of the evening of June 4 included a fight over some cigarettes and consuming some beer, but he denied a

blackout. He claimed he consumed only three beers and denied intoxication, as opposed to Orson Rundio's recollection. He acknowledged talking to Renee Rundio the next morning.

Dr. Haskins testified that Haight was not legally insane at the time of the homicide, meaning he did not have a serious mental disease or defect which so impaired his reasoning that he was unable to know the wrongfulness of his acts. However, Haskins found evidence of brain injury based upon the psychological tests administered.

After Haskins's testimony, the Netcare file as to Haight was admitted into evidence. The file was the only defense exhibit.

Lead counsel gave a closing argument which consumes less than forty lines of transcript in the record.

The three-judge panel found Haight guilty on all counts.

The mitigation hearing was originally scheduled for nineteen days after the guilt-innocence proceedings, but eventually proceeded on August 12. Dr. Lewis Lindner testified again. Apparently, his prior testimony was understood by the attorneys and trial judges as being automatically considered in mitigation. Lindner indicated that he had continued to research and review Haight's condition and that his opinion remained the same.

Dr. Lindner testified that, in his opinion, two classes of mitigation as defined by R.C. 2929.04(B) were present, specifically R.C. 2929.04(B)(3) and (B)(7). R.C. 2929.04(B) reads, *in toto:*

"(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

Lindner, in addition to the testimony given earlier, testified that reports from a psychiatric consultant of the Franklin County Corrections Center indicate that Haight, while still maintaining that he was not involved with the homicide, was having nightmares about someone being struck with a sledgehammer. The consultant, Dr. Pelt, was a psychiatrist with Southwest Mental Health Center who was responsible for psychiatric care for prisoners. Pelt felt that Haight could be suffering from posttraumatic stress disorder and from amnesia secondary to repression.

Lindner also indicated that he did not believe that Haight was competent to proceed with the mitigation hearing because of his inability to recall the occurrences surrounding the death of Terry Tagg. The inability of recall foreclosed the availability of certain potential mitigating factors.

The prosecution cross-examined Lindner with two questions regarding competence. A more extended examination, more clearly resembling a cross-examination than a direct examination, was then conducted by two judges on the panel. Additional brief direct and cross-examinations then followed.

Dr. Kristen Haskins then testified for the defense in mitigation. After her testimony for the prosecution during the guilt-innocence phase of the proceedings, Haskins had been provided additional records and reports to review. Haskins testified, without objection, that she felt the mitigating factors outweighed the aggravating circumstances in Haight's situation.

Haskins testified that a diagnosis of attention deficit disorder was more clear after review of the additional documents. She also had more information indicating how chaotic and conflicted the family in which Haight was raised had been. She was now aware that when Haight had medical and family problems while growing up, his mother was unwilling to work with any agency which tried to help. Haskins testified that she had felt mitigation outweighed aggravating circumstances when she testified before, but that feeling was now somewhat strengthened.

One of the judges then began an examination of Dr. Haskins with the following:

"Q. Dr. Haskins, you are an opponent of the death penalty?

"A. Sir?

"Q. You are an opponent of the death penalty?

"A. I don't believe I have ever gone on record as an opponent of the death penalty.

"Q. I'm asking you.

"A. I think my thinking continues to change, depending on the situations. I would not call myself a clear-cut total opponent of the death penalty.

"Q. So you don't think your personal opinions are affecting your judgment on what weight to put on certain factors?

"A. I don't believe so."

The judge followed with another series of questions, which attacked Dr. Haskins's opinion as to alcohol and drug abuse being mitigating factors in Haight's situation.

A second judge on the panel then conducted an examination, but one less hostile than the initial judicial examination.

A three-and-one-half page report from Dr. R.A. Bornstein was then stipulated into evidence and the defense rested. The prosecution rested without presenting any witnesses and the lead prosecutor then stated:

"Mr. Hogan: No. There was one thing arranged prior to this trial. On the date of the trial, the jury trial, Mr. Wolfrom came to me and suggested that if we asked the court if there was a conviction in the indictment, not to consider the penalty of death, they would be thinking about waiving the right to jury trial and trying this case to a two or to a three-judge panel.

"That information was relayed to Mrs. Tagg, the wife of the victim, she was the spokesman for the family. If you recall at this trial there must have been 12 different relatives here. She talked to the detective on the case, Kallay, who was opposed to it. She talked to my co-counsel, who had mixed feelings and she talked to me.

"It was her decision after consulting with the family, that she thought it was in her best interest and for her husband, that if they waive and try this case to a judge panel and if there was a conviction to the indictment, that the maximum consecutive sentence in this case, which is 40 years, which would be on top of his parole violation because he was on parole for burglary, would put him eligible for parole sometime in the mid 40's, 45 years from now. So the agreement was made, it was accepted, and if—Mrs. Tagg isn't here today, she couldn't get off

work, but she agreed that if they waived, we would be asking this court not to consider the penalty of death in this case.

"* * *

"Mr. Hogan: All I can say is what I have told you. We—I gave her the proposal. I said, here are your benefits, here are the good reasons, valid reasons for having a judge trial instead of a jury trial, here are our advantages, here are the disadvantages. You help me make the decision.

"She consulted with the detective, with my co-counsel and myself, she consulted with members of her family, she agreed and said, okay, if they are willing to waive a jury trial and try it to the court, I have no objections if I stand up in court basically and simply say that we ask you not to consider the penalty of death.

"That was not binding, this is not a stipulation. What we are saying, the mitigation outweighs the aggravating circumstances, it was just a statement that we were willing to make requesting you not to consider the penalty of death.

"Judge Crawford: So it comes from the victim?

"Mr. Hogan: And from me as well, I guess.

"Judge Travis: Personal, not a professional position. This is not an official position of the prosecuting attorney's office, is it?

"Mr. Hogan: As a spokesman for the prosecutor's office, as their representative, I thought the advantages outweigh the disadvantages and I went along with it. In fact, I encouraged it.

"Does that answer your question?"

After significant further discussion, the prosecution stipulated that if Peggy Tagg were called to the witness stand, she would testify that she would not like the court to consider the death penalty.

Cocounsel for the defense then gave a closing argument which takes up eighty-six lines of the transcript. The prosecution waived closing argument.

The three-judge panel then orally indicated that it was finding Haight competent to participate in the mitigation hearing. The proceedings were recessed until August 21, 1992. On that date, Haight made a brief statement:

"This is to the Tagg family. One, I do not know if I did kill your husband or not, but if I did, I am sorry, and if I didn't, I am sorry for the person who did this to your family."

The three-judge panel then found that the aggravating circumstances outweighed the mitigating factors and sentenced Haight to death.

The judges signed a decision intended to explain their analysis of the factors. To some degree, the decision is inconsistent with statements made by one of the judges orally at the time of sentencing, specifically as to what mitigating factors were found to exist. In open court, one of the judges said:

" * * * The court * * * has found two mitigating factors to exist.

"One of the mitigating factors is that the defendant's mental disease or defect existed at the time of the incident, and also at the time of the incident, the defendant had a history of substance abuse, both alcohol and drugs. Nothing else in this man's history and character can mitigate this offense."

In the written decision, the judges indicated that Haight's history, character and background have no weight as mitigating factors.

As to the mitigating factors set forth in R.C. 2929.04(B)(3), the court wrote:

"The Court has given some weight to the defendant's mental disease and/or defects as a mitigating factor. However, the evidence does not indicate that the disease and/or defect was a significant factor in the defendant's capacity to appreciate the criminality of his conduct, so the weight to be given to this factor is very slight."

R.C. 2929.04(B)(3) reads:

"Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct *or to conform his conduct to the requirements of the law* [.]" (Emphasis added.)

The court's written decision, therefore, considers only one of the two ways in which a mental disease or defect must be considered in mitigation—the lack of substantial capacity to appreciate the criminality of the conduct. The court did not, as required by the statute, consider as mitigation the effect of the mental disease or defect on Haight's ability to conform his conduct to the requirements of the law. This mistake pertains to assignment of error number two below.

In its written analysis of R.C. 2929.04(B)(7), the trial court also discussed (1) Haight's significant history of substance abuse, (2) allegations of a poor family upbringing, (3) the prosecution's statements regarding the death penalty, and (4) the stipulation that Ms. Tagg was not requesting that the death penalty be imposed.

On September 10, 1992, new counsel filed a motion for a new trial on behalf of Haight. On March 15, 1993, the original motion was supplemented with a lengthy memorandum in support of the motion. On May 6, 1993, the motion was supplemented with seven affidavits from potential mitigation witnesses who had not been called to testify. Two additional supplemental memoranda in support of

the motion were filed, followed by four more affidavits, including affidavits from the one mitigation expert originally appointed and the original cocounsel on behalf of Haight.

On May 10, 1993, a hearing on the motion for new trial was conducted. No testimony was taken.

On July 15, 1993, a decision was filed in which the three-judge panel indicated an intention to overrule the motion for new trial. The decision was docketed by the clerk as an order overruling the motion for new trial. Appellate counsel for Haight then timely filed a notice of appeal. Eight assignments of error have been set forth for our consideration:

"Assignment of Error Number One

"This· court, pursuant to its obligations under R.C. 2929.05(A), should find, during an independent examination and weighing of the mitigating factors against the aggravating circumstances, that the state failed to prove that the aggravating circumstances outweighed the mitigating factors by proof beyond a reasonable doubt and that the penalty of death was appropriate. This court should also find that the penalty of death imposed herein was excessive and disproportionate to the penalty imposed in similar cases.

"Assignment of Error Number Two

"The sentencing court did not properly weigh the aggravating circumstances and the mitigating factors.

"Assignment of Error Number Three

"The trial court erred in accepting appellant's jury waiver as a knowing, intelligent and voluntary waiver when said waiver was based on an underlying agreement that the court refused to enforce.

"Assignment of Error Number Four

"Defense counsel's action and omissions at Mr. Haight's capital trial deprived him of the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eight[h], and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

"Assignment of Error Number Five

"The trial court erred in sentencing Carl Haight to death as the penalty phase lacked the due process guarantees required under the Fifth and Fourteenth Amendments of the United States Constitution and Article One, Sections 10 and 16 of the Ohio Constitution when defense counsel did not have adequate notice that death was a possible penalty.

"Assignment of Error Number Six

"The multiplicative indictment returned in this case violates the Fifth Amendment Double Jeopardy Clause and created an unacceptable risk of arbitrary and capricious death verdict, thereby offending the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, Sections 9, 10 and 16 of the Ohio Constitution.

"Assignment of Error Number Seven

"The trial court violated R.C. 2929.41 in its sentencing of the appellant.

"Assignment of Error Number Eight

"The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev. Code Ann. Sections 2903.01, 2929.02, 2929.021, 2903.022, 2929.023, 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied."

The eighth assignment of error is overruled. The constitutionality of the death penalty was not raised by motion prior to trial or otherwise presented to the trial court for consideration. The issues contained in this assignment of error have been waived.

The fourth assignment of error alleges that Haight did not receive effective assistance of counsel during the proceedings. We agree and therefore sustain this assignment of error.

Because death is unique as a penalty, more is and should be expected of attorneys who undertake the responsibility to represent individuals who face the prospect of being executed. In Ohio, attorneys who are appointed to represent individuals facing the death penalty must receive special training and must attend continuing legal education courses devoted solely to death penalty litigation. Extra litigation experience is also required for those who are to be certified as either lead counsel or cocounsel for death penalty cases. The work is personally demanding, because counsel in death penalty cases are expected to develop a personal relationship with the accused so that the accused can feel he or she is represented by someone who cares whether he or she lives or dies.

Even if a higher standard were not expected of counsel here, their performance as counsel was deficient. The record indicates a minimum of consultation with the client. Cocounsel for Haight has indicated in his billing that he interviewed Haight for two hours on August 10, 1991. The next interview of any sort listed on the billing did not occur until March 20, 1992—over seven months later. Nothing in the record suggests that lead counsel was more diligent in this regard.

The lack of client contact certainly was not due to the press of other responsibilities on Haight's behalf. The attorneys filed a total of two pretrial motions. One motion was to enable Haight to be taken from jail to a funeral home to see his stepfather's body. This motion did result in a ruling.

The other motion was a motion to compel discovery. No hearing was ever conducted on the motion and no ruling was ever made.

Noticeable by its absence is a motion attacking the constitutionality of the death penalty as a penalty for someone who suffers from the mental deficiencies and defects from which Haight suffers. Even more noticeable is the lack of a motion to suppress the fruits of Haight's encounter with police on the day of his arrest. A serious argument could be made that he was arrested and/or seized without benefit of a warrant and without probable cause.

The record does not indicate that the services of a private investigator were ever retained, so whatever investigation was needed as to the facts of the homicide rested on counsel. Again, the information in the record does not reveal significant investigation.

The performance of counsel did not improve once the day for trial arrived. First, they talked their client into signing a jury waiver form. The death penalty cannot be ordered in Ohio if one or more jurors are not convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. Thus, the vote of a single juror could spare Haight the death penalty. Given the substantial mitigation evidence in the record after the affidavits appended to the motion for new trial are considered, we find it hard to conceive of all twelve jurors agreeing with a death penalty sentence.

Counsel apparently relied upon a theory that if, after all the evidence had been presented, the prosecution told the court that it was not asking for the death penalty and that the widow of the victim was not requesting the death penalty, then the three-judge panel would not order the death penalty. However, counsel concealed this theory from the court until after all the evidence had been presented and they had rested in the mitigation phase of the proceedings. Thus, the stipulated statement of the widow was not literally in evidence to be weighed as a mitigating factor and the statement of the prosecution was no more evidence than if given in a closing argument. If the theory of defense counsel had any validity in the first phase, the validity was lost by the failure to enter the stipulated testimony of Ms. Tagg into evidence so that it could appropriately be weighed as a mitigating factor.

The concealing of the defense agreement with the prosecutor from the trial court at the time that a waiver of jury was being discussed in open court robbed the court of the ability to assess accurately whether the waiver of jury was

knowing, intelligent and voluntary, and deprived counsel of the opportunity to be advised whether the agreement had any meaning whatsoever to the three-judge panel.

In reliance on the agreement, defense counsel pretty much abandoned their role as adversaries. They made no objection to the presence of a judge on the panel who had held a responsible position in the prosecutor's office while the office was prosecuting Haight. Counsel also made no objection to a substitution for a judge who was drawn at random to sit on the three-judge panel when the judge who had been properly drawn was temporarily unavailable. Counsel agreed to select a new judge rather than delay the trial a few days.

Once the trial commenced, counsel made no opening statement and engaged in minimal cross-examination. When the prosecution ran into difficulty in presenting the testimony of a forensic expert, counsel simply stipulated the pertinent testimony. The defense's closing argument in the guilt-innocence phase of the trial consumes only one and one-half pages of transcript.

The mitigation hearing was only marginally better. No opening statement was made. Dr. Lindner testified only briefly on direct examination. In fact, his testimony on direct examination is recorded on less than seven full pages. Dr. Haskins' direct examination runs approximately four and one-half pages. The closing argument was minimal, and is recorded on less than four full pages of transcript.

The legal standard for determining effective assistance of counsel for purposes of the United States Constitution is set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

We believe that the performance of defense counsel was clearly deficient and prejudiced Haight, especially in the sentence he received.

Therefore, as stated above, we sustain the fourth assignment of error.

The third assignment of error addresses the question of whether Haight made a knowing, intelligent and voluntary waiver of his right to a trial by jury.

The right to have a jury decide the guilt or innocence of an accused is one of the distinguishing features of the American criminal justice system. The right of an accused in Ohio to have a jury decide whether he or she faces the death

penalty is an extremely important right. The right can be given up only upon a knowing, intelligent and voluntary waiver. Such a waiver did not occur here.

Before the trial, the court was on notice that Haight had a history of mental illness and mental challenges. One of the judges on the panel had signed a judgment entry to provide for a competency examination. The same judge had continued the trial date to allow the prosecution to have Haight examined after Dr. Lindner had provided a written report indicating that Haight was legally insane. Under the circumstances, a careful inquiry as to whether Haight was making a knowing, intelligent and voluntary waiver was required.

Nothing bordering on a careful inquiry occurred. A report on competency from Haskins stated that Haight was functionally illiterate and that psychological testing showed he was reading at less than a third-grade level. Yet, the judge who received the report asked Haight only whether he had signed a written form. Haight was then asked if he knew that he had a right to trial by a jury of twelve individuals. However, he was never asked if he was willing to give up that right. The waiver form mandated by R.C. 2945.05 is clearly beyond the understanding of a person who reads at a second-grade level or worse. The form includes phrases like "voluntarily waive" and words like "relinquish" and "hereby." Many educated adults would struggle with the meaning of these words.

Further, nothing in the record indicates that Haight was aware that he was giving up a group of twelve decisionmakers (a jury) who had to vote unanimously for a death verdict in order for the death penalty to be ordered, or that he knew he was going to be sentenced by a group of three judges who could order him executed on a two-to-one vote.

Also important in the context of this case, the court never inquired whether Haight had been promised anything in return for waiving a jury. Had such an inquiry been made, the agreement between the defense and prosecution might well have been revealed and the waiver conditioned on the agreement rejected.

The legal authorities we consider in making our determination regarding jury waiver begin with Crim.R. 23(A) and R.C. 2945.05. Crim.R. 23(A) states:

"In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. * * *"

R.C. 2945.05 provides:

"In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: 'I _____, defendant in the above cause,

hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury.'

"Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial."

In *State v. Johnson* (1992), 81 Ohio App.3d 482, 611 N.E.2d 414, a case involving jury waiver, a different panel of this court cited with approval *Simmons v. State* (1906), 75 Ohio St. 346, 79 N.E. 555. In *Simmons,* the Supreme Court of Ohio stated: " 'Every reasonable presumption should be made against the waiver, especially when it relates to a right or privilege deemed so valuable as to be secured by the Constitution.' "

This corresponds to Article I, Section 5 of the Ohio Constitution, which states:

"The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."

We are aware of paragraph one of the syllabus of *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, which reads:

"There is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial. (Crim.R. 23[A] and R.C. 2945.05, construed and applied.)"

In the *Jells* case, the Supreme Court of Ohio was operating on a plain-error analysis because the issue regarding the jury waiver had not been addressed before the court of appeals. The body of the opinion reveals that Jells had at least been asked whether he had signed the jury waiver form of his own free will. Most importantly, *Jells* does not involve a situation in which the trial court is aware at the time the waiver is being considered that the accused is capable of reading at most at a second-grade level and, therefore, is not capable of reading and understanding the mandatory waiver form. Finally, the *Jells* case does not address the situation where the trial court is on notice that the accused may be seriously mentally ill, even to the point of being not guilty by reason of insanity.

In deciding the *Jells* case, the Supreme Court of Ohio took care not to overrule *State v. Ruppert* (1978), 54 Ohio St.2d 263, 8 O.O.3d 232, 375 N.E.2d 1250. The syllabus to the *Ruppert* case reads:

"1. Where an accused, charged with a capital offense, knowingly, intelligently, and voluntarily waives his right to a trial by jury pursuant to R.C. 2945.05 and

Crim.R. 23(A), and is subsequently tried before a three-judge panel, the panel may render a verdict upon a majority vote of its members pursuant to R.C. 2945.06.

"2. An accused, charged with a capital offense, has not knowingly, intelligently, and voluntarily waived his right to a trial by jury where, prior to waiving this right, he is misinformed that the three-judge panel may render a verdict pursuant to R.C. 2945.06 only by unanimous vote."

The misinformation conveyed in the *Ruppert* case is not more striking than the misinformation conveyed to Haight at the time he affixed his signature to the jury waiver form. The difference between the cases is that in *Ruppert* the misinformation came from a judge and defense counsel where as in Haight's case the misinformation came from his attorneys only.

In *Ruppert,* the Supreme Court of Ohio wrote:

"The final issue confronting this court is whether the accused knowingly, intelligently and voluntarily waived his right to a jury trial under Crim.R. 23. As noted in *Patton* [*v. United States* (1930) ], *supra,* 281 U.S. [276] at page 312, 50 S.Ct. 253 [at page 263, 74 L.Ed. 854, at pages 869–870], trial by jury is the normal, if not preferable, mode of disposing of issues of fact in criminal cases and the right must be jealously preserved. See *Estrada v. United States* (C.A.7, 1972), 457 F.2d 255. It 'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.' *Duncan v. Louisiana* (1968), 391 U.S. 145, 155, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491. Therefore, the court must insure that the accused's decision to waive such right is made with a sufficient awareness of the relevant circumstances and likely consequences of his waiver. *Brady v. United States* (1970), 397 U.S. 742, 748, 90 S.Ct. 1463 [1468–1469], 25 L.Ed.2d 747 [756]; *State v. Sharp* (Mo.1976), 533 S.W.2d 601; *State v. McKay* (1977), 280 Md. 558, 375 A.2d 228. Whether or not there is a valid waiver depends on the unique circumstances of each case. *Adams v. United States* (1942), 317 U.S. 269, 278, 63 S.Ct. 236 [241], 87 L.Ed. 268 [274].

"In the instant cause, Ruppert was misinformed that only a unanimous verdict of a three-judge panel could convict him of the offenses if he were to waive his right to a jury trial. Clearly, the defendant was not informed of an important consequence of his decision to waive a jury trial. As observed previously, by waiving his right to a jury trial, Ruppert not only was foregoing the right to be tried before a panel of 12 jurors, but also was waiving his right to a unanimous verdict. Irrespective of whether other important tactical considerations entered into his decision to waive a jury trial, Ruppert could not have knowingly, voluntarily and intelligently waived this right where he was misinformed as to the consequences of his decision in being tried before the court." *Id.,* 54 Ohio St.2d at 271–272, 8 O.O.3d at 236–237, 375 N.E.2d at 1255–1256.

The *Ruppert* case also involved an accused whose sanity and competence to stand trial were in issue.

We sustain the third assignment of error.

█ The fifth assignment of error is linked with the fourth. In the fifth assignment of error, appellate counsel alleges that "defense counsel did not have adequate notice that death was a possible penalty." In fact, trial counsel for the defense always had notice that death was a possible penalty. The case was indicted as a death penalty case and proceeded as a death penalty case up to the time of trial. The specifications that made death a possible sentence were never removed. What occurred was that trial counsel deluded themselves into thinking that, having prepared the case badly, if they also tried the case badly (but in a way which pleased the prosecution), the prosecution's indication that it did not want a death penalty and that the victim's family did not want the death penalty would guarantee a sentence other than the death penalty from the three-judge panel. The delusion of defense counsel does not mean that notice of death as a possible penalty was lacking.

The fifth assignment of error is overruled.

█ The sixth assignment of error alleges error based on the fact that the two aggravated murder charges in the indictment were essentially identical. Where an offender purposely causes the death of another in the process of stealing and the activity occurs indoors, the aggravated murder statute applies under two different legal theories. One theory relies on the fact that trespassing in a building where another individual is present constitutes trespassing in an occupied structure for purposes of the aggravated burglary statute, R.C. 2911.11. If the trespass is done with the intention of stealing something, then the essential elements of aggravated burglary are met.

The other theory relies on the definition of aggravated robbery set forth in R.C. 2911.01. Aggravated robbery includes situations where the offender, in the process of stealing, inflicts serious physical harm on someone.

The prosecution is not foreclosed from pursuing either theory, but the theories cannot be stacked to increase the weight of the aggravating circumstances for balancing with mitigating factors. Nothing in the record indicates that the three-judge panel handled the dual theories improperly.

Therefore, the sixth assignment of error is overruled.

In light of our ruling in regard to the third and fourth assignments of error, the conviction and sentence for Haight will be vacated and the case remanded for a new trial or other appropriate proceedings. Because the death penalty will be vacated, we will not ourselves independently weigh the mitigating factors against

the aggravating circumstances. Indeed we cannot, since we do not know what evidence will be before the court at a second set of proceedings.

The first assignment of error is therefore rendered moot. See App.R. 12(A).

The seventh assignment of error is also rendered moot by our ruling in regard to the third and fourth assignments of error. R.C. 2929.41 deals with situations where a death sentence has been rendered at the same time that sentences are given for other felonies. Since a death sentence no longer exists in this case, further comment by this court is inappropriate.

■ However, a new sentencing court may have to weigh the aggravating circumstances against the mitigating factors presented by this case. Since errors were made by the three-judge panel in its weighing process, we will address the merits of the second assignment of error rather than have the weighing process of the three-judge panel be considered the law of the case which is to be followed in subsequent proceedings.

By way of review, our present death penalty statute is the third such statute in Ohio in the last twenty-five years. In 1972, the Supreme Court of the United States struck down all state death penalty statutes then in existence on a theory that the statutes as then applied were discriminatory or lacking in consistency and rationality. See *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

Ohio then enacted a new death penalty statute, which in many ways paralleled the current statute. However, the newer law did not allow sufficient consideration of potential mitigating factors and was also struck down by the Supreme Court of the United States in *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. In its third attempt to craft a constitutional statute, the Ohio legislature followed *Lockett* scrupulously and resolved all significant death penalty issues of which the legislature was aware in favor of the accused.

However, the guidance from the Supreme Court of the United States involves two magnetic poles which at times pull in different directions. The states are expected to allow consideration of all potential mitigating factors and therefore to maximize discretion and individualization of sentencing. At the same time, the states are expected to ensure that discrimination is not involved, which requires restriction to avoid jurors voting their prejudices in the jury room. The tension between the forces from those two poles led one justice of the Supreme Court of the United States to abandon the effort to reconcile them. Justice Harry A. Blackmun, before his recent retirement, wrote:

"On their face, these goals of individual fairness, reasonable consistency, and absence of error appear to be attainable: Courts are in the very business of erecting procedural devices from which fair, equitable, and reliable outcomes are

presumed to flow. Yet, in the death penalty area, this Court, in my view, has engaged in a futile effort to balance these constitutional demands, and now is retreating not only from the *Furman* promise of consistency and rationality, but from the requirement of individualized sentencing as well. Having virtually conceded that both fairness and rationality cannot be achieved in the administration of the death penalty, see *McCleskey v. Kemp*, 481 U.S. 279, 313, n. 37, 107 S.Ct. 1756, 1778, n. 37, 95 L.Ed.2d 262 [292, n. 37] (1987), the Court has chosen to deregulate the entire enterprise, replacing, it would seem, substantive constitutional requirements with mere aesthetics, and abdicating its statutorily and constitutionally imposed duty to provide meaningful judicial oversight to the administration of death by the States." *Callins v. Collins* (1994), 510 U.S. ——, at ——, 114 S.Ct. 1127, at 1129, 127 L.Ed.2d 435, at 438.

With such inconsistent guidance from the top, small wonder exists that a clear-cut body of law on mitigating factors is not in existence in Ohio. Our research reveals only three trial court decisions in which a judge has used his or her discretion to weigh the factors as a basis for overturning a death sentence verdict from a jury. We could find no case in which an intermediate appellate court has used its independent weighing power to do so. We could find only three situations in which the Supreme Court of Ohio overturned a lower court sentence of death based upon an independent weighing of the factors. Thus, only six of approximately one hundred seventy-five death sentences to date have been overturned as a result of judicial reweighing of the mitigating factors and aggravating circumstances.

A comparison of the three trial court decisions is enlightening. In *State v. Robertson* (Apr. 20, 1989), Montgomery C.P. No. 88–CR–3178, unreported, the trial judge found as mitigating factors:

"[T]hat the Defendant is a youthful offender of thirty years, that he has a lack of significant history of prior criminal convictions and delinquency adjudications, and that the following other factors are significant and are of sufficient weight to counter the weight of the aggravating circumstances.

"The 'other mitigating factors' mentioned in R.C. 2929.03(F) allows this Court to consider that the Defendant had no advance plan to harm the employees or patrons of the place. There is no evidence of any acts of torture. There is no evidence that the shooting of Stephanie Hiatt was in furtherance of organized crime or a part of a criminal business. The Defendant was not hired to kill the victim nor was he shooting in retaliation or to silence witnesses to a prior crime. The evidence indicates the Defendant's decision to shoot Stephanie Hiatt was impulsive and not planned. The Defendant pursued education beyond the high school level. His family considers him a valued member of the family."

In *State v. Kiser* (Jan. 10, 1983), Ross C.P. No. 82–CR–69, unreported, the trial judge heavily considered the defendant's alcoholism and depression as mitigating factors in reaching a decision that the aggravating circumstances had not been shown to outweigh the mitigating factors. The court also considered Kiser's age of twenty-three as an indication that he was youthful and Kiser's record of breaking and entering and a series of alcohol-related misdemeanors as a lack of significant history of prior convictions.

The third case is *State v. Parsons* (Oct. 29, 1990), Franklin C.P. No. 88CR–01–279, unreported. The trial judge there was sentencing a forty-one-year-old school teacher who had no criminal record before he firebombed a trailer and killed its occupant with two shotgun blasts. The teacher had shown no remorse because he had continued to maintain his innocence at trial. The trial judge granted significant weight to the teacher's lack of significant prior record and the teacher's history, character and background. The trial judge also considered the teacher's potential for making a positive contribution to other inmates while incarcerated. The judge wrote that residual doubt should never be a factor in mitigation and that mercy was not appropriate for consideration.

The three cases in which the Supreme Court of Ohio remanded for resentencing following its independent weighing of the factors are *State v. Watson* (1991), 61 Ohio St.3d 1, 572 N.E.2d 97; *State v. Claytor* (1991), 61 Ohio St.3d 234, 574 N.E.2d 472; and *State v. Lawrence* (1989), 44 Ohio St.3d 24, 541 N.E.2d 451.

In *Watson,* the Supreme Court of Ohio found residual doubt to be a factor that was sufficient to overturn a death verdict when linked with a legally proper charge to the jury that its verdict was a recommendation.

In *Claytor,* the defendant was a paranoid schizophrenic who sometimes erupted in violent episodes. He had been committed to mental hospitals twelve times in the four years prior to his killing two security guards. The trial court and the intermediate appellate court had applied an incorrect standard of review to the mitigating factor involving a mental disease or defect, having blended a part of the rule for legal insanity (a total inability to refrain from acting) with the mitigation standard (a lack of substantial capacity to refrain). A five-two majority of the Supreme Court felt more weight should have been given to the defendant's mental disease and reversed the appellant's sentence of death solely on that mitigating factor.

In *Lawrence,* a similar mistake occurred. An erroneous jury instruction coupled with an inappropriate argument by the prosecution apparently left the impression that the standard for mitigation and for legal insanity were the same. Testimony at trial indicated that Lawrence suffered from posttraumatic stress disorder, depression, disassociative disorder and "schizotypical personality disorder." Lawrence killed two neighbors with whom he had been feuding after he

was angered at them having a party into the early morning hours and after a heated verbal exchange. The Supreme Court found the existence of several of the mitigating factors set forth in R.C. 2929.04, namely, inducing of the offense by the victim, strong provocation, the mental disease or defects of the offender, a lack of prior felony record, and several mitigating factors under the provision for consideration of any other factors. As to the other factors, the court wrote the following:

"Finally, we consider other factors that are relevant to the issue of whether the offender should be sentenced to death. We find his devotion to and care of his late mother during his high school years, his voluntary military service, and his deep love and caring for his children to be redeeming traits. We also find that appellant's mental health deteriorated following the loss of his son to sudden infant death syndrome. Appellant's severe depression caused by the loss of his son was untreated and eventually resulted in his quitting his job, the deterioration of his relationship with his neighbors, the disintegration of his marriage, and the tragic deaths of Cheryl and Jesse Mooney." 44 Ohio St.3d at 33, 541 N.E.2d at 460.

With this guidance as to what factors have been found of sufficient significance to overturn a jury verdict in favor of the death penalty, we analyze the information currently available in regard to Haight.

Shortly after his release from prison, Haight was evaluated by a team at Netcare and found to have a need to "increase coping skills, decrease depression, improve communication skills." He had no income and reported living with his family. He was listed as being "severely mentally disabled" in their evaluation. When interviewed (in January 1991), he gave a medical history that included "blackouts 'when [he] fights.'" Haight was quoted as saying, "I'm two different people. When I'm not drunk, I'm fine. When I'm drinking, I like to fight." He also acknowledged an extensive history of abuse of substances other than alcohol.

Alcoholism or alcohol dependence is now universally accepted by the medical profession as being a disease. The disease, left untreated, is usually fatal, either through its direct effects on the liver or through its effects on the brain and/or cardiovascular system. As a disease, alcoholism should be weighed as a mitigating factor in the same way that any other disease is weighed. Jurors and judges generally have difficulty in doing this because alcohol abuse historically has been viewed in moral terms as opposed to disease terms. However, judges in particular need to be aware of the current medical knowledge regarding alcoholism and need to treat the disease as a disease for purposes of mitigation.

As to Haight, evidence in the guilt-innocence phase of the trial indicated that Haight was drunk when he killed Terry Tagg. His disease of alcoholism had

significant involvement in the fact that the homicide occurred and must be given significant weight in the weighing process.

■ Several pieces of evidence indicate that Haight has organic thought disorder, some of which may be secondary to his alcoholism and to his history of substance abuse. Apparently, Haight began using substances to alter his moods as far back as age eight. He was admitted to a hospital for an overdose at age eleven. Some of the substances he used, specifically LSD, glue, paint thinner and alcohol, can kill or permanently alter cells in the central nervous system. Haight was limited in his intellectual capacity from birth, having consistently tested at levels which were near or below those considered mild mental retardation. His inherited intellectual limitation and organic brain disabilities should be given significant consideration in weighing mitigation factors against aggravating circumstances.

■ A third significant mitigating factor would be in circumstances where the family of the homicide victim does not want the accused to be executed. Families of some homicide victims may have their own ethical or religious reservations about capital punishment. They may not want another killing to occur and, from their perspective, to make the tragedy even worse. Some may not want to have the wound from the death of a loved one left open by the extended litigation that surrounds a death sentence. A prison sentence may provide finality for them and make it easier for them to go on with their lives. Therefore, in those circumstances in which the family of the deceased desires a prison term rather than capital punishment, significant weight should be given to their wishes at the time of the mitigation hearing.

A chaotic and/or deprived family background can also be a mitigating factor, although the details of Haight's background were not carefully developed or argued at the original mitigation hearing. We, therefore, do not further address the weight to be given in Haight's situation.

Our discussion of the four factors listed above is not intended to exclude consideration of other mitigating factors which could be presented at any subsequent hearing.

■ We have noted earlier in this opinion that the three-judge panel addressed only a part of the necessary considerations for the mental disease and/or defect factors set forth in R.C. 2929.04. For that reason, and because the three-judge panel's consideration of mitigating factors was inconsistent in other ways with our analysis, the second assignment of error is sustained.

In review, we sustain the second, third and fourth assignments of error. We overrule the fifth, sixth and eighth assignments of error. We do not fully address the first and seventh assignments of error because our ruling on the second and

third assignments of error in particular renders the first and seventh assignments of error moot.

All assignments of error having been addressed to the degree required by App.R. 12, the judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

JOHN C. YOUNG and PETREE, JJ., concur.