RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ALVA E. CAMPBELL,

        *Petitioner-Appellant,*

    *v.*

MARGARET BRADSHAW, Warden,

        *Respondent-Appellee.*

No. 09-3444

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-00193—Walter H. Rice, District Judge.

Argued: October 6, 2011

Decided and Filed: March 20, 2012

Before: MARTIN, GIBBONS, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Justin C. Thompson, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Morgan A. Linn, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Justin C. Thompson, David C. Stebbins, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, Andrew J. King, Kelly L. Schneider, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Morgan A. Linn, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

### OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. Petitioner–appellant Alva E. Campbell appeals the district court's order denying his 28 U.S.C. § 2254 petition for a writ of *habeas corpus* seeking relief from his death sentence. For the following reasons, we affirm the district court and deny Campbell's petition.

1

I.

The facts underlying Campbell's *habeas* case, as determined by the Ohio Supreme Court, are as follows:

> In 1972, Campbell was convicted of murder in the first degree under former R.C. 2901.01 and sentenced to life imprisonment. Twenty years later, he was paroled. In 1997, Campbell was arrested in Franklin County on a charge of aggravated robbery. He was held at the Jackson Pike Jail pending arraignment.
>
> On April 2, 1997, Deputy Sheriff Teresa Harrison was assigned to take Campbell to court, a task complicated by Campbell's confinement to a wheelchair. Two weeks before, jail doctors had wrongly diagnosed Campbell as having "hysterical paralysis"; in fact, he was faking. Not knowing this, however, Harrison placed Campbell in a van and drove him into downtown Columbus.
>
> Around 12:30 p.m., Charles Dials was paying a ticket at the traffic bureau of the Franklin County Municipal Court.
>
> At about the same time, Deputy Harrison was parking the van in a loading dock at the courthouse. Harrison got out of the van and began to assist Campbell. Suddenly, Campbell attacked her. He beat her severely, stole her service pistol, and fled.
>
> Charles Dials had just left the traffic bureau and was driving west on Fulton Street when Campbell ran outside. Campbell dashed into the street, stopped Dials's truck, and pulled open the driver's door. He told Dials, "I don't want to hurt you; just move over." And Campbell drove off, with Dials his prisoner.
>
> Campbell drove to a K-Mart at Williams Road and South High Street. He parked there and talked with Dials, telling him not to be nervous. Then he drove back to Central Avenue, turned onto a side street, and parked near a factory. There, Campbell took Dials's money and made Dials exchange clothes with him.
>
> Next Campbell drove back to High Street, where he bought a forty-ounce bottle of beer at a drive-through. He then returned to the K-Mart. There he sat talking with Dials "probably a good 2 hours," according to his confession.
>
> When a helicopter circled overhead, Campbell became nervous and turned on the radio to hear the news. An announcer reporting on the escape mentioned that Campbell had commandeered a red truck. Dials

said, "That's you, ain't it?" Campbell admitted it was, and they talked a while longer.

Campbell then moved the truck behind the K-Mart, driving around the back lot three times before he finally chose a parking space. He said, "Charlie, I got to get another car." Then he told Dials to "get on the floor board of his truck." Dials obeyed, and Campbell shot him twice: once in the face and once in the neck. The shots were fired from at least six inches away, but no more than two or three feet. Campbell tried to cover the corpse with Dials's coat.

Campbell then drove around to K-Mart's main lot and waited. While he sat waiting, Katie Workman drove in. She parked near the truck and began to get out of her car. As she opened her door, Campbell ran up to her car and put the gun to her head. "Move over * * *," he said. "I've just killed one man." Workman moved over, and Campbell screamed, "Give me your money, your keys." Workman threw her wallet and keys at Campbell and jumped out of the car. Campbell immediately drove away and went to the nearby Great Southern Shopping Center.

Around 3:20 or 3:30 p.m., James Gilliam was parked outside the Body Fit gym at the Great Southern, waiting for someone. When Campbell arrived, Gilliam was sitting in his car with the door open. Campbell forced his way into the space between Gilliam's car and another car.

Suddenly, Gilliam felt the car door pressing against his legs. Then he felt a gun against his head and heard a man say: "[D]o you want to die? Get in the car and move over." Gilliam looked up and saw a man he later identified as Campbell.

Gilliam pushed the door back at Campbell and stood up. Campbell said, "Get in the car and move over. I've done killed two people, and I'm not afraid to do it again." Gilliam backed away, then turned and ran.

Gilliam's keys weren't in the ignition, so Campbell jumped back into Workman's car. He drove around for a while, at one point buying another forty-ounce beer at a drive-through. Campbell drove off in haste, then abandoned the car in an alley and fled on foot. Campbell hid in a tree, but the tree's owner saw and reported him. Police soon surrounded the tree.

Seeing now that he was cornered, Campbell dropped the gun and surrendered. At 9:00 p.m., detectives from the Columbus Police Department and the Franklin County Sheriff's Office interrogated him on videotape. He gave the detectives a lengthy and detailed confession.

*State v. Campbell*, 738 N.E.2d 1178, 1186–87 (Ohio 2000).

II.

A jury convicted Campbell of four counts of aggravated murder.  *Id.* at 1187.
Count one was for aggravated murder by prior calculation and design;  counts two
through four were for aggravated murder during the commission of a felony (*i.e.*,
aggravated robbery, kidnaping, and escape).  *Id.*  Each aggravated murder count carried
four death specifications.  *Id.*  The jury also convicted Campbell of ten other counts
related to the murders.  *Id.*  The jury recommended a death sentence.  *Id.*

On direct appeal, the Ohio Supreme Court affirmed Campbell's convictions, but
vacated his death sentence and remanded because the trial court had failed to comply
with the allocution provisions of the Ohio Rules of Criminal Procedure.  *Id.* at 1187–90,
1205.  Complying with these provisions on remand, the trial court once again sentenced
Campbell to death and the Ohio Supreme Court affirmed.  *State v. Campbell*, 765 N.E.2d
334, 338, 344 (Ohio 2002).  During the pendency of his direct appeal, Campbell filed a
petition for post-conviction relief in state court.  The trial court denied relief, and the
Ohio Court of Appeals affirmed.  *State v. Campbell*, No. 03AP-147, 2003 WL
22783857, at *1 (Ohio Ct. App. Nov. 25, 2003).  The Ohio Supreme Court declined
Campbell's request for further review.  *State v. Campbell*, 809 N.E.2d 1158 (Ohio 2004)
(table).

Campbell then filed a petition for *habeas* relief in federal court pursuant to
28 U.S.C. § 2254, alleging twelve grounds for relief.  *Campbell v. Bradshaw*, No. 2:05-
cv-193, 2007 WL 4991266, at *15–16 (S.D. Ohio Nov. 27, 2007).  The magistrate judge
recommended that Campbell's petition be denied.  *Id.* at *64.  The district court adopted
the recommendations of the magistrate judge with respect to all of Campbell's claims,
with the exception of his claim that the trial court improperly prevented him from
presenting voluntary intoxication as a mitigating factor.  *Campbell v. Bradshaw*, No.
2:05-cv-193, 2008 WL 657536, at *28–29, 33 (S.D. Ohio Mar. 7, 2008).  The magistrate
judge subsequently recommended that this claim be denied because any error was
harmless, and the district court dismissed Campbell's petition in its entirety.  *Campbell
v. Bradshaw*, No. 2:05-cv-193, 2009 WL 773866, at *6–7, 13 (S.D. Ohio Mar. 18, 2009).

On appeal to this court, Campbell raises four grounds for relief: (1) that his trial counsel rendered ineffective assistance by introducing his incarceration records during the penalty phase; (2) that his trial counsel rendered ineffective assistance during the penalty phase by failing to present mitigating evidence regarding his juvenile incarceration; (3) that his trial counsel rendered ineffective assistance by not moving for a change in venue; and (4) that the trial court improperly prohibited him from arguing voluntary intoxication as a mitigating factor.

III.

Because Campbell filed his petition for a writ of *habeas corpus* after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we review *de novo* the district court's conclusions on issues of law and on mixed questions of law and fact and review its factual findings for clear error. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (*en banc*). Under AEDPA, "a federal court shall not grant a *habeas* petition with respect to any claim that was adjudicated on the merits in the state court unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Id.*; *see* 28 U.S.C. § 2254(d).

Under the "contrary to" clause, § 2254(d)(1), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The Supreme Court has recently clarified that "review under § 2254(d)(1) is limited to the record that was before the state court . . . ." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). In other words, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 1400; *see Bray v. Andrews*, 640 F.3d 731, 737 (6th Cir. 2011).

Under the "unreasonable application" clause, § 2254(d)(1), a federal *habeas* court may grant the writ only if the state court's application of clearly established federal law to the facts of the prisoner's case was objectively unreasonable in light of the evidence presented in the state court proceedings. *Williams*, 529 U.S. at 409–11. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law," *id.* at 410, such that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Finally, under the "unreasonable determination" clause, § 2254(d)(2), federal courts must bear in mind that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010).

Section 2254(d), as amended by AEDPA, is a "purposefully demanding standard." *Montgomery*, 654 F.3d at 676 (citing *Harrington*, 131 S. Ct. at 786). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 131 S. Ct. at 786 (internal quotation marks omitted). To obtain relief, a *habeas* petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87. This "highly deferential standard" requires that determinations made in state court "be given the benefit of the doubt." *Pinholster*, 131 S. Ct. at 1398 (internal quotation marks omitted).

IV.

Campbell's first three grounds for relief rest on ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim, Campbell must demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011). To show deficiency, Campbell must overcome the "strong[] presum[tion]" that his counsel "rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  To demonstrate prejudice, Campbell must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  In other words, he must show a "'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 131 S. Ct. at 1403 (quoting *Harrington*, 131 S. Ct. at 791).

Because all of Campbell's claims regarding ineffective assistance were adjudicated on the merits by the Ohio state courts either during direct appeal or on post-conviction review, § 2254(d) governs our standard of review.  *See Sutton v. Bell*, 645 F.3d 752, 755 (6th Cir. 2011).  When analyzing a *Strickland* claim under § 2254(d), our review is "'doubly deferential.'" *Pinholster*, 131 S. Ct. at 1403 (quoting *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)).  The key question "'is whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard.'" *Foust*, 655 F.3d at 533–34 (emphasis added) (quoting *Harrington*, 131 S. Ct. at 788).

A.

Campbell's first ineffective assistance of counsel claim involves his counsel's decision to admit his entire adult incarceration record (Defense Exhibits C and J) into evidence during the penalty phase.[1]  Campbell raised this claim on direct appeal to the Ohio Supreme Court.  In rejecting this claim, the Ohio Supreme Court stated the following:

> [Campbell] argues that the defense should not have introduced Campbell's prison records. However, Dr. Smalldon consulted and relied upon those records in diagnosing Campbell. Campbell does not contend that the defense should have dispensed with Smalldon's testimony, which was critical to the case for life, just to keep his prison records out of the trial.

---

[1]Defense Exhibit J is Campbell's prison record from the Ohio Department of Rehabilitation and Correction, where he was incarcerated for over twenty years for his 1972 murder conviction.  Defense Exhibit C is Campbell's jail record from the Franklin County Correctional Facility, where he was incarcerated prior to trial in this case.  Although Campbell refers only to Exhibit C in his opening brief, he clarified in his reply brief that his claim actually extends to both Exhibits C and J—that is, his entire incarceration record.

[Campbell also] argues that no rational attorney would attempt to present good behavior in prison as a mitigating factor in a case like this, where the murder was committed after the defendant's escape from jail. We disagree. Reasonable attorneys could easily conclude that no legitimate mitigating factor should be withheld from the jury.

*Campbell*, 738 N.E.2d at 1200.

Campbell contends that the introduction of his incarceration records from both the state penitentiary and the county jail allowed the jury to learn damaging facts about his background during the penalty phase and that much of this evidence would otherwise have been inadmissible. Campbell argues that the admission of these records allowed the State, *inter alia*, to reveal in its rebuttal proof facts surrounding his prior murder conviction and parole eligibility, to discuss Campbell's poems about an escaped prisoner, and to demonstrate that he had possessed contraband and presented a continuing threat to himself and others while incarcerated. Campbell's counsel objected to the use of some of the evidence the prosecution introduced in rebuttal, but the trial judge overruled the objection on grounds that Campbell's counsel had opened the door to such testimony by introducing the incarceration records. Campbell does not contest that his prison records contained positive as well as negative information; rather, he argues that counsel should have elicited this positive information through live testimony.

Campbell has not shown deficiency and prejudice regarding the admission of his incarceration records. Campbell characterized his counsel's decision to introduce the records as "wholesale laziness." A review of the trial transcript, however, indicates otherwise. During his opening statement at the penalty phase, Campbell's counsel stated:

> [Y]ou will hear that a lot of bad things have happened to Alva, but you will also hear that Alva did a lot of bad things to other people and we're going to present that to you.
> We're going to present his long history of criminal behavior and his anti-social behavior.
> . . .
> We want you to hear all of that because that's the person you are here to judge. We're not going to hide that from you; and as we present

> this evidence, you will hear a lot of other very bad things about Alva, but you as jurors have to have the courage to listen to all of that and see how it fits in with this whole issue of who Alva is today and how that fits in with the argument that this person may be bad but we don't kill persons just because they are bad.

His counsel struck a similar chord during closing argument, stating that "[Campbell]'s been bad.  But we don't kill every bad man . . . . Look at all the records and try to understand how Alva became the way he is.  After you consider that, I think you will think that the life sentence is the appropriate sentence."

It appears that the decision to introduce the incarceration records was not borne of "laziness" but was rather part of a strategic effort to be candid with the jury about Campbell's past in an effort to gain credibility and, ultimately, obtain a life sentence for Campbell.  In addition, in introducing *all* of Campbell's incarceration records, counsel sought to contrast Campbell's records from the state penitentiary with his records from the county jail to show that Campbell, while perhaps not adjusting well in a local facility, was well-suited for placement in a state penitentiary.  Campbell's counsel made this decision when faced with overwhelming evidence that Campbell had committed a terrible crime and had a troubled background that would be difficult to present in a positive light.  Ultimately, counsel's approach did not convince the jury.  However, we must take care to "eliminate the distorting effects of hindsight" when evaluating attorney performance.  *Strickland*, 466 U.S. at 689.  Because "there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight . . . ." *Harrington*, 131 S. Ct. at 791.  In short, an ineffective strategy does not perforce demonstrate deficient assistance of counsel.

Campbell's repeated citation to *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997), is unavailing.  In *Rickman*, we found that defense counsel had been deficient because he had "convey[ed] to the jurors an unmistakable personal antagonism toward [his client]" and had displayed a "degree of hostility" toward his client that was "nothing short of shocking and professionally outrageous." *Id.* at 1156, 1158, 1159.  Campbell does not

allege, and our review of the record does not reveal, anything similar in kind or degree to the antagonizing, outrageous behavior that marked counsel's performance in *Rickman*. Therefore, we cannot say, especially under the doubly deferential review that § 2254(d) requires, that it was unreasonable to find that Campbell's counsel was not deficient.

But even if the decision to introduce the incarceration records did constitute deficient performance, it was not unreasonable for the state court to find that Campbell suffered no prejudice. Dr. Jeffrey Smalldon, the defense's expert during the penalty phase and to whose testimony Campbell does *not* now object, reviewed all of Campbell's incarceration records prior to his testimony. On the basis of these records, Smalldon described Campbell's adjustment at the county jail as "poor." He recounted that "from beginning to end [Campbell] was viewed as a very serious security risk" at that facility. Smalldon continued:

> I've reviewed the copies of letters that he wrote to a woman outside prison where he attempted to engage her collaboration in a sort of escape scheme that would have involved her bringing a saw blade into the prison.
> I'm aware that the deputies at the jail concluded that he had been digging caulk out in his cell at one point. Though there's also indicated in the record some uncertainty at one point whether the digging that they thought they saw had been done by him . . . .
> There were at least a couple of documented verbal altercations, at least one of which involved a pretty explicit verbal threat from Mr. Campbell to one of the officers.
> I would describe his adjustment there as overall poor.

Smalldon further testified that Campbell had been convicted when he was nineteen for shooting a law enforcement officer with the intent to kill, and then only four and a half months after his release, was again charged with and convicted of first-degree murder. Thus, Smalldon testified before the jury about much of the damaging content of the incarceration records to which Campbell now objects. Had these records not been admitted, the jury still would have heard that Campbell posed a serious security risk while incarcerated, threatened prison staff, actively contemplated escape, and had previously been convicted of murder. The incarceration records may have lent more detail to Campbell's checkered past in prison and jail, but they introduced little that was

not already before the jury.**2** We therefore find that Campbell did not suffer prejudice because he has not shown a "'substantial' . . . likelihood of a different result" had the incarceration records not been admitted. *See Pinholster*, 131 S. Ct. at 1403 (quoting *Harrington*, 131 S. Ct. at 791).

B.

Campbell also alleges ineffective assistance of counsel on the grounds that counsel left a substantial gap in the mitigation evidence by not introducing evidence of the detrimental impact of Campbell's lengthy period of juvenile incarceration. In post-conviction proceedings, Campbell submitted the affidavit of Dr. Clemens Bartollas, who averred that mitigation factors important in forming Campbell's character and behavior—factors that included his juvenile incarceration—were not adequately presented to the jury. *See Campbell*, 2003 WL 22783857, at \*8. The Ohio Court of Appeals rejected this contention on the following grounds:

> Although Drs. Haskins and Bartollas believe a better job could have been done presenting defendant's psychological background, they have the benefit of perfect hindsight, the distorting effect of which must be avoided . . . . Moreover, the affidavits of Drs. Haskins and Bartollas are largely cumulative of, or alternative to, the mitigation evidence presented by defense counsel and thus do not support substantive grounds for an ineffective-assistance claim.
> . . .
> "[W]hen, as here, counsel has presented a meaningful concept of mitigation, the existence of alternate or additional mitigation theories does not establish ineffective assistance." The petition and supporting documents reveal defendant has not set forth sufficient operative facts to show defense counsel violated an essential duty to defendant or rendered deficient assistance in the penalty phase of defendant's capital trial.
> Further, the petition and supporting documents do not show defendant was prejudiced as a result of counsel's failure to present additional mitigation witnesses. The trial court found defense counsel did an "excellent" job in presenting all the points the jury needed to consider

---

**2**Further, we note that had counsel selected only positive examples from the incarceration records and asked live witnesses to explain them (*e.g.*, prison staff with whom Campbell had a positive rapport), it is not clear that Campbell's other "bad acts" in prison would not have come in on rebuttal anyway. As we have held when analyzing the potential for harmful rebuttal evidence under Ohio law, "every positive argument by a defendant potentially opens the door to a more-harmful response." *Morales v. Mitchell*, 507 F.3d 916, 948 (6th Cir. 2007) (internal quotation marks omitted); *see also Sutton*, 645 F.3d at 763–64.

for purposes of mitigation, and, in light of the overwhelming aggravating circumstances, there would have been no reasonable probability of a different outcome. Significantly, the Ohio Supreme Court found the defense presented an "impressive and substantial case in mitigation," but ultimately held the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt and the sentence of death was appropriate.

Here, because the affidavits defendant submitted . . . are largely cumulative to the mitigation evidence defense counsel presented, and in light of the Supreme Court's holding in *Campbell II* that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt, we conclude defendant has not shown a reasonable probability exists that the outcome of the penalty phase of defendant's trial would have been different, such that the jury would conclude the death sentence is not warranted.

*Campbell*, 2003 WL 22783857, at *9–10 (internal citations omitted). Thus, the Ohio Court of Appeals viewed much of the mitigation evidence of Campbell's juvenile years as cumulative to the information already before the jury, especially in light of the aggravating circumstances of Campbell's crime, and on those grounds found no prejudice.

Campbell argues that (1) his lengthy period of juvenile incarceration was overwhelmingly negative; (2) defense counsel did not put forth evidence of this period in any depth during the penalty phase; and (3) defense counsel's failure to introduce this evidence constituted ineffective assistance of counsel because it minimized the mitigating effect of his undeniably horrible childhood. We address each point in turn.

According to Bartollas's affidavit,[3] Campbell did indeed have an overwhelmingly negative experience during his teenage years. Bartollas described Campbell as a "state-raised youth," who "spent most of his adolescent years in various types of out-of-home placements." He noted that Campbell claimed he had received sexual pressure from peers and abuse from staff at the facilities in which he was placed.

---

[3]Bartollas both submitted an affidavit during state post-conviction proceedings and gave live testimony at the federal evidentiary hearing. However, as this claim was adjudicated on the merits in state court, our review "is limited to the record that was before the state court . . . ." *Pinholster*, 131 S. Ct. at 1398. We therefore only consider Bartollas's affidavit, which was before the state court on post-conviction review. We similarly cannot review the testimony that defense counsel William Mooney gave at the federal evidentiary hearing because it was not part of the state court record.

Bartollas described that Campbell had a "rather volatile behavior pattern" in which he defied authority.  Bartollas further noted that Campbell reported being physically assaulted while at the facilities and had been discharged due to his behavioral problems and had run away on numerous occasions.  Campbell had also engaged repeatedly in inappropriate sexual activity with other boys; however, it was unclear whether Campbell did so on his own initiative or only after being coerced.  On this record, we agree with Campbell that his placement in juvenile facilities was largely negative.

The next question is to what extent this negative history was presented to the jury during the penalty phase.  Smalldon did mention Campbell's placements during his adolescent years, quoting at times from records from these facilities during his testimony.  However, we agree that Smalldon did not describe the negative conditions that Campbell faced—and the negative reactions that Campbell had to those conditions—in the juvenile facilities.  And it does not appear that Campbell's counsel had any strategic reason to ignore the evidence of Campbell's juvenile placements, especially because they were aware, through Smalldon's testimony, that such evidence existed.

But even if counsel was deficient in this regard, Campbell has failed to show that the state court, in finding no prejudice, unreasonably applied *Strickland* and its progeny.  First, we cannot say that the state court's finding that evidence of Campbell's juvenile placements was cumulative was  an unreasonable application of *Strickland*.  Disturbing as it was, the evidence of Campbell's juvenile placements pales in comparison to the utterly awful conditions of his childhood home—conditions that included repeated instances of rape, incest, neglect, and physical and emotional abuse—and which were described at length to the jury during sentencing.  Therefore, much of the evidence of the juvenile placements does not "differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *See Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) (internal quotation marks omitted).  And as we have repeatedly held, "the failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional

violation." *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007) (internal quotation marks omitted); *Broom*, 441 F.3d at 410.[4]

Second, to the extent that the evidence of juvenile placements may not be cumulative, Campbell still cannot overcome the fact that much of the information contained in the evidence not presented was adverse. According to Campbell, the failure to include information regarding his juvenile placements allowed the prosecution to imply that he had been rescued from his horrible childhood by age ten or eleven and that he had been given educational and social opportunities thereafter. This much is true: the trial court, which acknowledged Campbell's abusive home environment, noted that Campbell "was removed from the [abusive home] environment at the age of ten or eleven," subsequently "received educational opportunities" at various placements, and demonstrated that his "academic work and social progress were good . . . ." It does appear the prosecution was able to use the lack of evidence about Campbell's juvenile placements to its advantage.

However, "mitigating value must be weighed against the potential harm its introduction might have done." *Sutton*, 645 F.3d at 763. Here, had evidence of Campbell's juvenile placements been presented, the prosecution might not have been able to minimize the mitigating evidence of his childhood years, but it certainly would have seized upon Campbell's serious behavioral problems that persisted well into his teenage years. As Bartollas's affidavit demonstrates, Campbell was both victim and victimizer during his placement at the juvenile facilities. Campbell was described as having "explosive episodes," a resistance to authority figures, and a "rather volatile behavior pattern." He was discharged from facilities because he had "an unfavorable influence with the younger boys, as well as[] his peers." Campbell also had serious problems regarding his sexual behavior. According to one report, he was "literally

---

[4]We also note that Campbell inaptly rests much of his argument on cases where the federal court weighed the mitigating and aggravating circumstances *de novo*, rather than evaluating the reasonableness of the state court's weighing. Here, because the state court addressed prejudice and did not apply an incorrect legal standard, our review is not *de novo* but rather employs AEDPA's reasonableness framework. Campbell's citations to *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Williams v. Taylor*, 529 U.S. 362 (2000) are accordingly of limited persuasive force. *See Sutton*, 645 F.3d at 765.

molesting the other boys almost every opportunity he could . . . ."  Therefore, had a complete picture of Campbell's juvenile placements been presented, the jury would have heard evidence not only of the conditions of the facilities and their effect on Campbell, but also of Campbell's inappropriate and destructive behavior while at those facilities. We have often found that the existence of this kind of adverse information, contained within mitigating evidence that was not presented, can preclude a finding of prejudice. *See, e.g.*, *Sutton*, 645 F.3d at 763–64 (upholding finding of no prejudice where evidence not admitted contained descriptions of extensive drug abuse and a discharge from the Navy); *Carter v. Mitchell*, 443 F.3d 517, 531–32 (6th Cir. 2006) (upholding finding of no prejudice where evidence not presented would have revealed history of, *inter alia*, "drug use and alcohol abuse, and [a] notoriously quick temper and violent character"); *Scott v. Mitchell*, 209 F.3d 854, 880–81 (6th Cir. 2000) (upholding finding of no prejudice where evidence not admitted contained evidence of "robbery, assault, kidnaping, and other violent acts upon innocent citizens") (internal quotation marks omitted).  Further, the aggravating circumstances of Campbell's crime, including his prior murder conviction and his felony-murder specifications, *Campbell*, 738 N.E.2d at 1187, 1202–03, mean that "only evidence with an *overwhelming* net mitigating value could produce a reasonable probability of a life sentence."  *See Sutton*, 645 F.3d at 763 (emphasis added).  However helpful the information contained in Bartollas's affidavit might have been, it plainly contains no such overwhelming mitigating value.

Third, it bears noting that when Campbell was convicted in this case, he was in his mid-forties.  He had already been convicted of shooting a law enforcement officer with intent to kill, had already been convicted of murder, and had spent nearly all of his adult life in prison.  Campbell's counsel presented "an impressive and substantial case in mitigation," *Campbell*, 738 N.E.2d at 1191, particularly with respect to his childhood home, which the trial court agreed was "an abusive environment which undeniably affected [Campbell's] personality."  Thus, the mitigation evidence of Campbell's terrible childhood was particularly strong, and Campbell's decades in prison far removed him from the trauma of his teenage years.  These factors also weigh  against a finding of prejudice.

On this record, we find that the state court did not unreasonably apply *Strickland* in finding that Campbell suffered no prejudice as a result of not presenting mitigating evidence regarding Campbell's placement in juvenile facilities.

C.

Campbell's final ineffective assistance of counsel claim is that his counsel rendered deficient performance by failing to move for a change in venue. Campbell claims that his crime was "probably the most heavily publicized and infamous one" in county history and the subject of extensive, negative pretrial publicity. He cites prospective juror awareness of the facts of the case as well as television and newspaper coverage. The Ohio Court of Appeals rejected this claim. The court appeared to recognize that Campbell's case drew extensive pretrial media attention, but noted that "even where there is extensive pretrial publicity, a change of venue is not automatically granted." *Campbell*, 2003 WL 22783857, at *6. The court then appropriately examined the record on *voir dire*:

> The voir dire in this case covered nine days, during which the prospective jurors were questioned extensively about the pretrial publicity and their ability to impartially reach a verdict based on the evidence presented in court. During voir dire, the court excused several jurors who it determined could not be impartial or who leaned toward the death penalty. The jurors who were empanelled indicated they could try the case fairly. Although such assurances by prospective jurors are not dispositive of the defendant's right to an impartial jury, the empanelling of the jury with the defense having used only four of six available peremptory challenges belies defendant's claim the jury could not be impartial due to the pretrial publicity. While it remained open for defendant to demonstrate a juror had actually formed an opinion, thereby raising the presumption of partiality, neither the petition nor supporting documents defendant submitted present sufficient operative facts demonstrating pretrial publicity prejudiced the empanelled jury.

> Finally, the trial court stated that even if defense counsel had moved for a change of venue, the court would have denied the motion "because, in [the court's] mind, a very fair and objective jury was selected." Given the discretion accorded to the trial court in granting a change of venue, defendant has not shown the outcome would have been different if defense counsel had moved to change venue.

*Id.* at \*6–7 (internal citations omitted).

This conclusion was not an unreasonable application of *Strickland*. Although the record before us is insufficient to determine whether the failure to move for a change of venue was a strategic decision or not, even if counsel was deficient, it was not unreasonable for the state court to find that Campbell suffered no prejudice.

It is well established that if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the court should grant the defendant a change in venue. *See Irvin v. Dowd*, 366 U.S. 717, 722–24 (1961); *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). Prejudice can be presumptive or actual. *Foley*, 488 F.3d at 387. "Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community" and "is rarely presumed." *Id.* In the absence of presumed prejudice, "the trial court has a responsibility to confront the fact of the publicity and determine if the publicity rises to the level of 'actual prejudice.'" *Ritchie v. Rogers*, 313 F.3d 948, 962 (6th Cir. 2002). "[A] searching voir dire of the prospective jurors is the primary tool to determine if the impact of the publicity rises to th[e] level" of actual prejudice. *Id.* At *voir dire*, the court must examine the jurors' statements to determine if there is a community-wide sentiment against the defendant; however, "[n]egative media coverage by itself is insufficient to establish actual prejudice." *Foley*, 488 F.3d at 387. When evaluating jurors, "mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint . . . ." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998). Rather, "[t]he relevant question is 'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed.'" *Foley*, 488 F.3d at 387 (second alteration in original) (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). If a biased juror was seated who should have been dismissed for cause, we must reverse the conviction. *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001).

We acknowledge that Campbell's case was featured prominently in local media coverage and that most of the prospective jurors were aware of the case. However, Campbell has not shown sufficient facts to demonstrate presumptive prejudice based on pretrial publicity because we "rarely presume[]" prejudice based on pretrial publicity, and Campbell has not shown the that there was "an inflammatory, circus-like atmosphere" that would support finding prejudice in this case. *See Foley*, 488 F.3d at 387. Further, Campbell has failed to show that he has suffered actual prejudice. Counsel and the trial court carefully questioned prospective jurors during *voir dire* concerning their knowledge of the case from news reports and whether they could judge the case based solely on the evidence that would be presented in court. A number of prospective jurors indicated that they could not, and were excused. Notably, Campbell has not identified any juror who was actually seated that indicated an inability to set aside any prior knowledge about the case or to judge the case fairly and impartially. *Cf. Hughes*, 258 F.3d at 458, 464 (finding juror bias and reversing conviction where juror clearly stated that she could not be fair and neither counsel nor the trial judge responded). It does appear that some of the prospective jurors inappropriately discussed the case during *voir dire*. However, evidence of inappropriate discussions among jurors, without more, does not demonstrate actual bias. *See United States v. Gaitan-Acevedo*, 148 F.3d 577, 590–91 (6th Cir. 1998) (reversal not warranted where jurors, contrary to court's instruction, had discussed the case, commented on the number of cars owned by one defendant, and joked about convicting the defendant so they could go home, on grounds that the jurors' comments did not evidence actual bias).

As Campbell has not demonstrated any presumptive or actual prejudice based on pretrial publicity, he suffered no prejudice from his counsel's failure to move for a change in venue. We therefore find that the state court did not unreasonably apply *Strickland*.

V.

Campbell's final claim is that the trial court improperly prohibited him from arguing voluntary intoxication as a mitigating factor. This claim is rooted in an interaction between the trial judge and counsel regarding an instruction on voluntary intoxication:

> The Court: Motion to include alcohol and/or drug impairment. Again, that's an instruction.
>
> And let me just say this: I probably would overrule that simply because in my mind and view of the evidence, I'll listen to you, but there was no alcohol or drug impairment. He had a 40 ounce.
>
> I've viewed the tape [of Campbell's confession]. I think he was perfectly sober, and certainly there has to be some evidence that he was impaired before I would even consider that and I don't see it, and so I probably wouldn't, probably wouldn't allow it in the instruction[s] and wouldn't allow you to argue it because it just ain't there.
> . . .
> Defense Counsel: Well, we haven't heard from our psychologist yet so—
> The Court: All right. Maybe that may differ, but all I've [got] right now is he had one 40 ounce in three hours, and that's all I know.
>
> I watched him talk for an hour and a half myself; and, of course, I listened to the detective.
>
> So there has to be something stronger than that for me to allow you to argue that as a mitigating factor, but I'll certainly listen to . . . Dr. Smalldon.

The Ohio Supreme Court found that the trial court had erred, given the evidence that Campbell had consumed significant quantities of alcohol prior to committing the crime. The Ohio Supreme Court reasoned as follows:

> Campbell asked the trial court to instruct the jury in the penalty phase that voluntary intoxication is a potential mitigating factor. The judge refused because he did not find sufficient evidence of voluntary intoxication to raise a jury issue.
>
> We disagree with the trial judge's reasoning. There was evidence that Campbell drank forty ounces of beer during the offense. Whether or not he was intoxicated according to any particular definition is beside the point. The fact that he had a substantial amount of alcohol in his system was a circumstance of the offense and was relevant to mitigation . . . .

However, a trial court is not required to instruct on specific nonstatutory mitigating factors. Certainly nothing in the penalty-phase instructions precluded the jury from considering [Campbell's] alcohol consumption. In fact, the trial court instructed the jury to consider, without limitation, "any other factors that are relevant to the issue of whether the offender should be sentenced to death" as mitigating factors. We have held repeatedly that such an instruction is sufficient to allow the jury to consider all the mitigating evidence before it. Thus, the trial judge was correct in refusing to instruct specifically on voluntary intoxication, even though "erroneous reasons were assigned as the basis" for that refusal.

*Campbell*, 738 N.E.2d at 1192 (internal citations omitted). The district court concluded that the trial court's decision to preclude Campbell's counsel from arguing that his intoxication was a possible mitigating factor violated his Eighth Amendment rights to have the jury consider all potential mitigating evidence and remanded to the magistrate judge to determine if the trial court's decision constituted harmless error. *Campbell*, 2008 WL 657536, at *28–29. On remand, the magistrate judge concluded that the trial judge's error in precluding the argument for mitigation purposes was harmless because the mitigating impact of the evidence was unlikely to have resulted in a different sentence. *Campbell*, 2009 WL 773866, at *7–13. The district court agreed with this conclusion. *Id.* at *1–6.

It appears that, when considering the trial court's ruling, the Ohio Supreme Court misconstrued Campbell's argument. Although recognizing that Campbell argued that "the trial judge precluded him from presenting evidence of [the] mitigating factor[ of] . . . voluntary intoxication," the Ohio Supreme Court rejected this claim on grounds that the trial court was not required to instruct on specific non-statutory mitigating factors. *Campbell*, 738 N.E.2d at 1190, 1192. However, Campbell broadly claims that the trial court effectively prevented him from arguing voluntary intoxication—not that the trial court merely failed to give an instruction on voluntary intoxication. Because, through

no fault of his own, the state courts did not reach the core of Campbell's argument, we review this claim *de novo*.[5]  *See Jells v. Mitchell*, 538 F.3d 478, 505 (6th Cir. 2008).

We agree with the district court that the trial court improperly prohibited Campbell from arguing voluntary intoxication as a mitigating factor. *Campbell*, 2008 WL 657536, at *28–29. During a sentencing hearing in a capital case, the jury must be permitted to consider any relevant mitigating factor. *Tibbets v. Bradshaw*, 633 F.3d 436, 446 (6th Cir. 2011) (citing *Eddings v. Okla.*, 455 U.S. 104, 112 (1982)).  Here, there is ample evidence that Campbell had "a substantial amount" of beer prior to the commission of the crime.  *Campbell*, 738 N.E.2d at 1192.  Furthermore, Campbell's sister testified that their parents frequently got drunk and fought, and social service records reflected that the parents were heavy drinkers.  Smalldon diagnosed Campbell as having a history of alcohol abuse, which likely reflected alcohol dependence, and an antisocial personality disorder.  Smalldon also testified that, when drinking, Campbell's "thoughts would turn to his hatred for his father," and speculated that Campbell may have experienced a "rage reaction" when he killed Dials.  Despite this evidence, the trial judge did not allow Campbell to argue voluntary intoxication, stating that "I probably wouldn't, probably wouldn't allow [voluntary intoxication] in the instruction[s] *and wouldn't allow you to argue it* because it just ain't there." (emphasis added).  Because this mitigating evidence was both ample and relevant, it was error to prohibit Campbell from introducing it.  *See Tibbets*, 633 F.3d at 446.

The question is thus whether the trial court's error was harmless or prejudicial. An error is not harmless if it had a substantial and injurious effect or influence in determining the outcome of the case. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008).  "Even if there is only 'grave doubt about whether a trial error of federal law has substantial and injurious effect or influence

---

[5]In so finding, we reject the Warden's claim that Campbell failed to raise this issue properly before the district court.  We agree with the district court that Campbell's reference to this argument in his initial *habeas* petition, albeit rather fleeting, is sufficient to allow review on the merits. *See Campbell*, 2008 WL 657536, at *27.  Further, Campbell's traverse significantly expanded on this claim—giving the Warden ample opportunity to address the merits of this claim in response to the magistrate judge's Report and Recommendation.

in determining the jury's verdict, that error is not harmless.'" *Fields v. Howes*, 617 F.3d 813, 823 (6th Cir. 2010) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995), *overruled on other grounds by Howe v. Fields*, 132 S. Ct. 1181 (2012)).  To determine the effect of an error, the question is "whether the guilty verdict actually rendered in this trial was surely unattributable to that error." *Doan*, 548 F.3d at 459 (internal quotation marks omitted).

The trial court's error did not have a substantial and injurious effect or influence on Campbell's death sentence.  Campbell argues that, because of the trial court's ruling, he was unable to argue that "[a]lcohol was the nexus around which Campbell's rage, his dysfunctional thinking, and his childhood scars coalesced," that his "feelings of rage and hatred for his father . . . roiled to the surface when Campbell drank alcohol," and that his "rage issues surfaced on the day he shot Dials."  In analyzing prejudice, however, we must first bear in mind what Campbell *was* allowed to argue.  He put on detailed evidence of his abusive, alcoholic father and the broken home in which he was raised. He put on evidence of his mother's neglect and alcoholism.  He put on evidence of his feelings of rage when he thought about his father.  And he put on evidence of his diagnosis of alcohol dependence and antisocial personality disorder.  On this record, an inability to argue voluntary intoxication during the commission of his crime was not ostensibly prejudicial, as the jury already had before it ample evidence of the destructive effects of alcohol in Campbell's life and its general effect on his development and personality.

Further, Campbell's attempts to show that his "rage issues surfaced on the day he shot Dials" due to his alcohol intake are undercut by the record itself, in which Smalldon explained that Campbell refused to talk in any depth about how a "rage reaction" could have been linked to his shooting of Dials.  As the district court found, "[Campbell] himself cast doubt" upon the theory that he experienced any type of "rage reaction" during the commission of his crime. *Campbell*, 2009 WL 773866, at *5.  In any event, Campbell has not presented any evidence, whether introduced at trial or during post-conviction proceedings, showing that his alcohol intake was such that it

would have exacerbated his underlying personality disorders and inhibited his impulse control.

And even if we assume that Campbell was voluntarily intoxicated to a point that it affected his actions on the day in question, we are unconvinced that prohibiting him from arguing intoxication had a substantial influence on the jury's sentence of death. Voluntary intoxication under Ohio law is—at most—a "weak mitigating factor." *State v. Turner*, 826 N.E.2d 266, 282 (Ohio 2005); *State v. Fitzpatrick*, 810 N.E.2d 927, 944 (Ohio 2004); *see also Campbell*, 2009 WL 773866, at *6. To distinguish this black letter law, Campbell argues that he did not seek to introduce evidence of voluntary intoxication as a stand alone factor, but rather to show its "synergistic effect" on his behavior and his resultant "rage reaction." And he relies upon *State v. Haight*, 649 N.E.2d 294, 315 (Ohio Ct. App. 1994), to show that intoxication can be given "significant" weight. But *Haight* is an intermediate appellate court decision, followed by at least eight decisions of the Ohio Supreme Court holding that voluntary intoxication merits little weight in mitigation. *Campbell*, 2009 WL 773866, at *6 (collecting cases). And Campbell cites to no case apart from *Haight* to support his theory that intoxication should be treated with significant mitigating weight (with or without a "synergistic effect" on other factors relevant to Campbell's case). Further, the Ohio Supreme Court has upheld a death sentence where the defendant consumed drugs and more alcohol than Campbell prior to the commission of the crime, and where the defendant had also been diagnosed with alcohol dependence and a personality disorder. *See State v. Johnson*, 858 N.E.2d 1144, 1184–85, 1186 (Ohio 2006) (upholding death sentence despite the fact that defendant was diagnosed with alcohol dependence and personality disorders and had consumed thirty-two ounces of hard liquor or distilled wine as well as various amounts of crack cocaine and marijuana).

In preventing Campbell from raising voluntary intoxication as a mitigating factor, the trial court committed error. However, we do not have "grave doubt" about whether that error had a substantial and injurious effect or influence in determining the jury's verdict. *See Fields*, 617 F.3d at 823. Therefore, we find the error harmless.

VI.

For the reasons above, we affirm the decision of the district court to deny Campbell's petition for a writ of *habeas corpus*.